IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

HEART IMAGING TECHNOLOGIES, *
LLC,                         *
                             *
            Plaintiff,       *  Case No. 1:12CV1020
vs.                          *
                             *  Winston-Salem, North Carolina
MERGE HEALTHCARE             *  July 16, 2013
INCORPORATED                 *  10 a.m.
                             *
            Defendant.       *
*****************************

            TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
             BEFORE THE HONORABLE JAMES A. BEATY, JR.,
                  UNITED STATES DISTRICT JUDGE.

APPEARANCES:

For the Plaintiff:        JAMES L. LESTER, ESQUIRE
                          KELLY ROBINSON, ESQUIRE
                          MacCord Mason, PLLC
                          Post Office Box 2947
                          Greensboro, North Carolina 27402


For the Defendant:        TERRENCE J. TRUAX, ESQUIRE
                          BENJAMIN J. BRADFORD, ESQUIRE
                          PETER H. HANNA, ESQUIRE
                          Jenner & Block, LLP
                          353 N. Clark Street
                          Chicago, Illinois 60654-3456


                          GARY L. BEAVER, ESQUIRE
                          Nexsen Pruet, PLLC
                          Post Office Box 3463
                          Greensboro, North Carolina 27402


Court Reporter:           Lori Russell, RMR, CRR
                          P.O. Box 20593
                          Winston-Salem, North Carolina 27120

            Proceedings recorded by stenotype reporter.
          Transcript produced by Computer-Aided Transcription.

1       P R O C E E D I N G S

2              THE COURT:  Counsel, if you will, identify

3  yourselves.

4       This matter being called now is Heart Imaging

5  Technologies versus Merge Healthcare Incorporated.

6       If the attorneys for Heart Imaging will identify

7  yourselves for the record.

8              MR. LESTER:  Your Honor, Jim Lester with MacCord

9  Mason representing Heart Imaging.

10             MS. ROBINSON:  Kelly Robinson with MacCord Mason

11 for Heart Imaging.

12             MR. BEAVER:  Your Honor, Gary Beaver.  I'm the

13 local counsel for Merge.  I've got three attorneys with the

14 Jenner & Block firm.  I'll let them each introduce

15 themselves.

16             MR. TRUAX:  Good morning, Your Honor.  It's Terry

17 Truax from Jenner & Block on behalf of Merge Healthcare,

18 Your Honor.

19             MR. BRADFORD:  Good morning.  Benjamin Bradford

20 also on behalf of Merge Healthcare from Jenner & Block.

21             MR. HANNA:  Good morning, Your Honor.  My name is

22 Peter Hanna.  I'm also here on behalf of Merge from Jenner &

23 Block.

24             THE COURT:  Counsel, as you know, the Court has

25 given you notice that the matter is today for preliminary

1    injunction based upon the briefing that was earlier filed.

2    I know there have been several attempts to expand this

3    beyond that and the Court has indicated to you that will not

4    be done.  What's before the Court was what was a part of

5    your preliminary injunction request as relates to Claim 1 of

6    patent '381.

7         Even this morning or late yesterday an additional

8    briefing was filed as an attempt to add more before the

9    Court, and it was Defendant's motion to file a supplemental

10   briefing to bring into account all the matters that have

11   been done moving toward a full claim construction, but that

12   matter will not be undertaken by the Court at this time.

13   I've indicated the limited purpose for this hearing and

14   that's what it will be.  So if you'll direct yourself in

15   that regard, I would appreciate it.

16        I'll start with Heart Imaging to the extent this is

17   your motion for preliminary injunction.

18             MR. LESTER:  Thank you very much, sir.

19        We will be showing some slides to illustrate the

20   motion.  I want to thank you for taking up this motion for

21   preliminary injunction.  We recognize it's extraordinary

22   relief that we're seeking, but I think after you've reviewed

23   the facts and the law you will realize that this

24   extraordinary remedy is appropriate in these circumstances.

25        Heart IT is a small company.  It has 17 employees.

1    It's in Durham -- based in Durham.  They only have $3
2    million in sales each year.  It was founded in 2000 by three
3    doctors and research scientists who were doing heart imaging
4    research.  Dr. Judd, one of the primary inventors, is here
5    with me, as are the other two inventors:  Dr. Kim and
6    Dr. Chen.  Also with you today are Mrs. Judd and Heart
7    Imaging's vice president of sales, Mr. Perez.
8        This is a small company, but they've had a big impact
9    in the world of medical imaging.  They have the distinction
10   of inventing and being the first to get FDA approval in 2005
11   of a zero-footprint medical imaging viewer.  The small
12   company has sparked a revolution in medical imaging with
13   their viewer called WebPAX.
14       Zero-footprint viewers allow doctors to examine and
15   make diagnoses from anywhere using any device equipped with
16   a standard web browser, from a PC to a notebook computer to
17   a mobile phone.  Unlike the prior art, there are no
18   downloads, no plug-ins, no special equipment or software.
19   This means that a user will never get a pop-up message
20   saying you need administrator authority to download this
21   thing or a Java plug-in required.
22       Achieving zero-footprint capabilities in a medical
23   image viewer that was suitable for diagnosis was very
24   difficult.  The inventors first had to overcome the general
25   belief in the field that it was impossible.  We've submitted

```
1    textbooks and articles to that effect in the briefing
2    papers.  But once they asked the question that nobody had
3    asked before, can we make a viewer that (A) runs in a
4    standard browser, (B) converts images without loss of
5    diagnostic data and (C) permits medical diagnosis, they had
6    to figure out how to overcome the limitations of the
7    Internet, which was not designed for transmitting medical
8    images.  The end result was a remarkable product.
9        Just as background, I would like to show you a quick
10   clip of the WebPAX medical imaging viewer in operation,
11   which we can use to help illustrate some of the terms that
12   are not in dispute but are in the claims.
13       Could I get the screen up?
14       Okay.  We're going to play this clip of the medical
15   imaging viewer.  You'll note there are high-quality images
16   on the right side of the screen.  In a second, you'll see a
17   heart beating.  The left side of the screen are what are
18   called thumbnails.  These are navigational images that allow
19   the doctor to move around within the study.  Each one of
20   those thumbnails represents a different series of images.  A
21   series can be one image or it can be a group of images.
22   When you're looking at a movie of a heart beating, that's a
23   lot of images that are being run together in a loop.  The
24   entire procedure that's illustrated on that screen is called
25   a study or a procedure.  And that's the person went into the
```

1    machine and we came out with all of these different images.
2    So that's just sort of the background of the terminology
3    we'll be using.
4         The goal that I just described of being able to use a
5    standard Internet browser to make diagnosis is stated in the
6    '381 patent as the -- under the summary of the invention as
7    what they were setting up to do.  And this is an important
8    phrase in the patent, so I would like to read it to the
9    Court.
10        "The Present Invention proceeds from the realization
11   that if medical images of different formats could be
12   processed in such a way that limitations of current Internet
13   standards could be overcome, any standard Internet browser
14   could be used as a diagnostic workstation to allow any
15   medical image to be viewed from any location on earth
16   without specialized hardware or software."
17        That's the essence of the invention.  That's what the
18   industry has come to know as a zero-footprint viewer and
19   that's what we're arguing about today.
20        The WebPAX product has been successful.  It's  been
21   installed in major medical centers across the country,
22   including Duke, Ohio State, and Johns Hopkins.  We're here
23   today because Heart IT's patents are being infringed by a
24   much larger competitor, one who is taking customers and
25   market share from our company as a direct result of this

1    infringement.  This is occurring at a time when Heart IT

2    should be enjoying the fruits of its innovation, a term

3    described by Merge's own publicity as having favorable

4    regulatory headwinds, a time when the federal government is

5    spending tens of billions of dollars to encourage hospitals

6    to move to image-enable their medical records.

7        Last August, just as we were preparing to file this

8    complaint, Heart IT found itself fighting for its very

9    survival.  Merge and now several other large players in the

10   medical industry are rushing into the zero-footprint market

11   that Heart IT created, and they're taking away customers

12   with their size and their willingness to infringe this

13   patent.  The injury Heart IT is facing is irreparable and

14   the company needs the Court's help to hold on to its

15   position in the market until a full hearing on their case

16   next July.

17       Merge has argued that Heart IT shouldn't be given a

18   preliminary injunction because they waited too long to file

19   this motion.  Dr. Judd explained in his affidavit that for a

20   company of his size just getting a complaint prepared and

21   bringing a large company like Merge to court was a

22   significant undertaking, and it took many months to occur.

23       When it became obvious that the "meaningful use"

24   guidelines that were being written by the government and

25   were driving the move to image-enabled EHR, electronic

1    health records, were going to be released in 2014 or were

2    going to come into effect in 2014, they realized they

3    couldn't wait until then to stop the infringement.  So a

4    preliminary injunction was prepared and filed last December.

5    The company's timetable was reasonable, prudent, and was as

6    fast as could be expected for a small company in this

7    situation.

8        The Court has established firm ground rules for today's

9    argument, and we plan to stick to the issues and claim

10   construction that we briefed in our motion.  With those

11   limitations in mind, I would like to proceed to a review of

12   the four factors.

13           THE COURT:  All right, sir.

14           MR. LESTER.  The first one is likelihood of

15   success on the merits.  We need to prove that we're likely

16   to succeed on infringement of Claim 1 and that we're like --

17   even taking in mind the burdens, that we're likely to

18   withstand the validity challenge by Merge.

19       Now, to prove infringement, we've got a lot of words to

20   wade through.  Claim 1 of the '381 patent is very long.  A

21   lot of these words repeat themselves, but I think if we

22   break it into smaller pieces we can parse through it rather

23   quickly.

24       The first element is:  "A method of managing"

25   information -- "medical information, comprising receiving at

1    a first computer a plurality of image series resulting from

2    a patient medical imaging procedure."

3        We have an illustration here at the top of the patient

4    who's going to undergo a procedure.  She's going into an

5    MRI.  The next level is the series of pictures that are

6    taken during that procedure and then each of those series

7    can consist of one or more single images.  There's no real

8    dispute that Merge's product does these things.

9        The next element is:  "Each image series comprising one

10   or more digital medical images in a format that is

11   incompatible with displaying in an Internet web browser."

12       Merge has argued in its opening brief this term was

13   vague and ambiguous.  We disagree, especially in the context

14   of today's hearing.  The specification states several times

15   that DICOM is not a browser-compatible format.  For example,

16   up here it says --

17            THE COURT:  So DICOM is what you're attempting to

18   move away from with your patent?

19            MR. LESTER:  What we do is we take DICOM, which is

20   what comes out of the scanner, and we convert it so that it

21   can be viewed on the browser.  So DICOM is not browser

22   compatible.  What gets sent to the user is.

23            THE COURT:  So what happens initial -- before your

24   process is in play, what happens with DICOM?  Are you saying

25   that the images are produced; and in order for someone out

1  in the field to use them, they would have to have a

2  designated workstation as if they were in the hospital doing

3  the same thing?

4             MR. LESTER:  That's what the prior art taught.  It

5  also taught putting a lot of extra add-ons and plug-ins onto

6  a PC to translate the DICOM images.  What we do is we do it

7  without having to add that extra stuff.  The DICOM image is

8  what comes out of the machine.  It goes into the archives at

9  the hospital.  What this invention does is it makes it

10  accessible on any device with a standard browser.

11             THE COURT:  All right, sir.

12             MR. LESTER:  So within the context of this

13  invention, DICOM is defined in the patent as not browser

14  compatible; and Merge's product literature and the testing

15  that was done by Dr. Grizzard establishes that the input to

16  the Merge system is DICOM files.  So they meet that element

17  of this claim.

18        The next element is:  "Providing a pointer associated

19  with the patient medical imaging procedure."

20        The top picture here is from the patent.  It's showing

21  a pointer and the bottom picture is the Merge system also

22  showing a pointer.  Again, this is when you -- Dr. Grizzard

23  testified if you click on that or if you select that

24  highlighted yellow line there the medical imaging procedure

25  appears.

1    The next element is:  "In response to user selection of

2    the pointer at a second computer" -- and again, the second

3    computer is the user's computer -- "providing an Internet

4    web page for display in an Internet web browser on the

5    second computer, the Internet web page forming a user

6    interface for a medical image workstation when displayed in

7    the Internet web browser."

8    The top picture here is Figure 16 from the patent.

9    It's a little dark, but that's described in the

10   specification as having a series of still pictures and movie

11   pictures.  The bottom picture is a picture of Merge's

12   workstation.  You can see that it has -- well, we'll get on

13   to the elements that it has, but it was testified to also by

14   Dr. Grizzard that that had the elements of a medical image

15   workstation.

16   In its surreply, Merge argued that a medical image

17   workstation did not require images at full resolution.  That

18   was an issue that was brought up there.  They speculated

19   that that's how we were interpreting that element of the

20   claim.  We agree that that term doesn't require full

21   resolution images.  What requires full resolution images is

22   the phrase at the end of the claim that says it has to

23   permit diagnosis.  If the Court will permit me, I'll just

24   talk about that at the end when we get to that clause of

25   permitting medical diagnosis.

1    The next element is:  "Without requiring software
2    executing outside the Internet web browser on the second
3    computer."
4    This is the essence of the zero-footprint invention.
5    They don't require any of the things that will cause a
6    pop-up like that to appear on your computer.  They don't
7    require ActiveX.  They don't require Java.  They don't
8    require any extension to the power of the browser in order
9    to view the medical images.  All you need is a standard
10   browser.
11         THE COURT:  Isn't it part of the argument,
12   though -- and I'll let you address it, as well as the other
13   side -- that as to the second computer some of those things
14   are internally already there as a part of the Internet web
15   browser?  They just don't pop up.
16         MR. LESTER:  If it's fully installed, that's
17   correct, but eventually it probably will.  And what we're
18   saying is it's -- it needs to be able to run in essentially
19   any computer that has the standard browser.
20         THE COURT:  So how do you define the standard
21   browser?  What's encompassed in that?  I turn on my
22   computer.  Routinely I go to an Internet browser.  I don't
23   look at how I got there, but it's then -- if I go then to a
24   site looking for something, that's what comes up.  What --
25   what distinction are you making here of not requiring any

1    other software?

2           MR. LESTER:  We're saying the standard browser

3    doesn't have -- some people may ship a standard -- a

4    standard browser with a plug-in attached to it.  Some

5    computer makers may already include that on the one that you

6    buy, but eventually that third -- it's really a third-party

7    piece of software.  It's either going to run out of date and

8    you're going to get one of these error messages or it's

9    going to be -- or you won't have the right plug-in in order

10   to view it.

11          THE COURT:  So you have no control, though, what

12   is encompassed with an Internet browser.  You're just

13   saying:  We put the image on.  We preconvert all of our

14   images.  The user comes in, clicks on using an Internet

15   browser.  We don't know how he got here.  He just used an

16   Internet browser.

17          MR. LESTER:  We're saying anybody should be able

18   to with a standard browser view our images.  That's right.

19   Whether he was lucky enough to have something preinstalled

20   on it or not, the base model, the general lowest common

21   denominator of that browser is the one that we're calling

22   the standard browser; and we've established -- we've set up

23   the invention -- the invention is claimed to be able to run

24   in that standard browser.

25          THE COURT:  All right, sir.

1    MR. LESTER:  The Merge products at least appear to

2    meet this requirement.  In their advertising, they call it a

3    zero-download application that runs entirely within a

4    browser.  In their DICOM conformance statement, they say it

5    will run with only basic web browser requirements and no

6    software download or install.  So this term is understood in

7    the industry.  People are advertising for it.  It does have

8    a meaning and that's the meaning we think the Court should

9    adopt.

10    The next element is -- let me take a deep breath

11    because it's a long one -- "the user interface comprising a

12    rectangular grid of one or more rows and one or more columns

13    for simultaneously displaying a plurality of navigational

14    images in the user interface on the Internet web page, and

15    providing to the user the plurality of navigational images

16    for display in the user interface of the Internet web page,

17    the plurality of navigational images corresponding to

18    different ones of the image series from the patient medical

19    imaging procedure."

20    Again, this is basically just the concept of having the

21    thumbnails that allow you to move from series to series of

22    the imaging procedure.  And, in fact, this element was

23    described as being in Merge's product by Dr. Shih, who is

24    their expert.  He said, "As I understand it, the Accused

25    Products provide users with 'thumbnails,' each thumbnail

1    representing a series of one or more images."

2        The next element also describes these navigational

3    images.  It says:  "The plurality of navigational images

4    comprising a format that is compatible for displaying in an

5    Internet web browser without requiring software executing

6    outside the Internet web browser on the second computer, the

7    plurality of navigational images being converted to a

8    browser compatible format before being transmitted over the

9    Internet."

10       This is the conversion process where it gets to be

11   browser compatible.  Dr. Grizzard tested the images that

12   were sent back from the Merge product and determined that

13   they were being sent in a PNG format, portable network

14   graphics, which is a browser-compatible format.  It will

15   show up in basically any web browser.

16       The next element is:  "In response to user selection of

17   one of the plurality of navigational images, providing to

18   the user the one or more digital medical images of the image

19   series associated with the selected one of the navigational

20   images for display in the user interface of the Internet web

21   page."

22       Okay.  It means when you click on the thumbnail, the

23   whole series of pictures that it represents will show up.

24   Again, Dr. Shih helped us out here.  He said:  "Selection of

25   a thumbnail displays one larger-sized image from the

1    corresponding series of images.  The user is able to

2    'navigate' the image workstation by scrolling through the

3    images in the series of images being displayed, or by

4    selecting a different thumbnail."

5        The next element is:  "The one or more digital medical

6    images comprising a format that is compatible for displaying

7    in the Internet web browser without requiring software

8    executing outside the Internet web browser on the second

9    computer, the one or more digital medical images providing

10   medical information to the user, the one or more digital

11   medical images being converted to a browser compatible

12   format before being transmitted to the second computer."

13       This is essentially the same as the previous

14   requirement; that the navigational images be converted

15   before being sent to the user's computer.  "As with the

16   navigational images" -- and Dr. Grizzard testified:  "As

17   with the navigational images...the medical image in Exhibit

18   4 was received from Honeycomb," from the Merge product, "in"

19   the "PNG format."  So it had been converted to

20   browser-compatible format before being sent.

21       And we're to the last element:  "Wherein the medical

22   image workstation enables user navigation among the

23   plurality of navigational images and the one or more digital

24   medical images of the image series to permit medical

25   diagnosis from the one or more digital medical images

1   without requiring software executing outside the...web

2   browser."

3        This is the final clause of the claim.  It summarizes

4   the previous clauses and adds the requirement of permitting

5   medical diagnosis.  This term requires diagnostic-quality

6   images to be transmitted in the second computer.  In

7   Exhibit A to our response to the surreply, so it was in the

8   last pleading we sent to you, is a copy of the patent with

9   all the references to diagnosis highlighted; and ten times

10  in the patent it says "without loss of diagnostic data" or

11  "without loss of diagnostic information."  That's an

12  essential component of the invention.  When we say it

13  permits medical diagnosis, it means that you don't lose

14  diagnostic information when you're converting the images

15  from the DICOM format to the browser-compatible format.

16       Also, in our -- we mentioned in the response in the

17  file history -- this was one of the exhibits in Dr. Judd's

18  affidavit.  He referred to diagnostic-quality medical images

19  as being lossless.  In the industry, "lossless" means it

20  maintains its full resolution.  So that's an interpretation

21  that we're asking the Court to make.  That -- it's not

22  really important for infringement, but it's important for

23  distinguishing some of the prior art.  So we feel that the

24  full resolution of the images needs to be retained in order

25  for it to permit medical diagnosis.

1    And taking a look at Merge's product, in Mr. Tolle's

2    declaration he said that one of the features which drive

3    sales of iConnect Access is the ability to perform a

4    diagnostic reading of images.

5    And I'd also like to play a clip.  In our complaint, we

6    mentioned a YouTube video.  We also provided a transcript of

7    that YouTube video where a Merge employee was describing the

8    Accused Products.  I would like to play that clip for you

9    right now, not the whole clip but just a couple of minutes

10   of it; and I'd like the Court to note how many of the claim

11   terms are mentioned here in just the description he gives of

12   their product.  He talks about thumbnails, series, browser

13   compatible, no software to install, lossless images, and the

14   fact that it's usable for diagnostics.

15   (Video clip played for the Court, not recorded.)

16   MR. LESTER:  So we believe that there's a clear

17   case of infringement here; that the Merge products do

18   infringe all of the elements of Claim 1 of the patent.

19   In the briefing, Merge made basically one

20   noninfringement argument.  They said that software outside

21   the browser has to run in order to deliver images and allow

22   navigation; and they identified that software as some

23   software on the web server, as well as software for

24   controlling an input device, such as a mouse, and software

25   used to translate the DICOM images into another format.

1    That interpretation is wrong for three reasons and

2 these were the responses we gave you in the brief.  It

3 requires reading the final element of the claim out of

4 context with the rest of the claim.  In the final element,

5 the words "on the second computer" weren't repeated for the

6 fourth time.  They were left out.  It just said "without

7 software executing outside the browser."

8    They took that to mean that if any software was running

9 anywhere else in the system that there wouldn't be an

10 infringement and that's inconsistent with the previous

11 elements of the claim because the previous elements of the

12 claim required the server to provide images and to provide

13 things to the second computer.  It's not going to be able to

14 provide things to the second computer if it doesn't have

15 software running on it.  So it's internally inconsistent.

16    It's also inconsistent with the preferred embodiment,

17 which describes people clicking on things to select and

18 describes the server sending things back and forth; and I've

19 just highlighted a view of those references here on the next

20 slide.  Just highlighted in red is all the references to

21 "clicking," which would obviously require mouse software on

22 the first computer and things being sent.  You have images

23 sent by the http server to the browser.  You have things

24 being transferred from the server to the browser.

25    So their noninfringement argument from the briefing

1    that we're discussing today is just -- it doesn't work.

2    It's inconsistent with the specification and it's

3    inconsistent with the rest of the claim.  So we feel like

4    we've -- that's what we've got to say about the infringement

5    element of the likelihood of success on the merits.

6        I'd like to turn to the invalidity arguments and their

7    invalidity arguments in the briefing basically come down to

8    they believe it was anticipated by Feingold.  Now, to

9    anticipate, that means every element in the claim has to be

10   taught by a reference.  They also claim it was anticipated

11   by Sakusabe and that it was obvious.

12       Let me first turn to Feingold.  Feingold is a 1997

13   article describing a report distribution system that was set

14   up in a hospital in Pennsylvania.  It converted DICOM images

15   to GIF files, which are browser compatible, but it lacked

16   most of the other elements of the claim.  Most importantly,

17   Feingold converted every DICOM image to a browser-quality

18   image by subsampling or reducing the resolution of the

19   images to eliminate 75 percent of the diagnostic information

20   that's in them.

21       Now, they're using big numbers there.  What they say is

22   you take a CR image, computed radiography, that's 2048 by

23   1780 pixels.  That's got a lot of pixels in it.  You have to

24   multiply those two together to get the resolution.  And they

25   reduce each of those numbers by half to 1024 by 890.

1    Putting that into terms that are easier to process, if you
2    started with a 10 by 10 matrix and reduced it to 5 by 5 --
3    10 by 10 has a hundred pixels in it, 5 by 5 only has 25.  So
4    you're making the same ratio of a change to these images.
5        So what Feingold does is he reduces the quality of the
6    image so they're smaller and can be sent around easier.  So
7    that does not meet the requirement of being able to permit
8    diagnosis from the images because they've been reduced in
9    such dramatic quality.  They don't have the same amount of
10   diagnostic information that the original DICOM images had.
11       Another limitation of Feingold or another element of
12   Feingold that doesn't meet the claims of the patent is it --
13   the only navigational image in Feingold is the study image.
14   It's a thumbnail in the study box.  Clicking on it either
15   loads a single image or a single series, but it doesn't load
16   the entire study.  There's nothing in the article that it
17   loads a plurality of series as required by the claim.
18       So to summarize, Feingold lacks diagnostic-quality
19   images.  It lacks receiving a plurality of series from the
20   study.  It doesn't have thumbnails that correspond to
21   multiple series, which is also a requirement in the claim,
22   and it doesn't provide you with navigation using thumbnails.
23   Other than that initial button where you select the study
24   and maybe a series pops up, the only navigation is these
25   "next" and "previous" buttons in the Feingold reference.

1      Let's turn to the Sakusabe reference.  Sakusabe is a
2  2000 article describing another report distribution system
3  that was implemented in Japan.  It converted images to PNG
4  and JPEG formats, but it also lacks many of the elements of
5  the claim.  Most importantly, it's not prior art.  The
6  invention of the '381 patent was disclosed to Northwestern
7  and was conceived in the summer of 1999, at least six months
8  before Sakusabe presented his paper in 2000 so --
9           THE COURT:  Was that done in 1999 as a part of
10  '381 or some other patent?
11           MR. LESTER:  It was the -- well, it disclosed the
12  invention that became the '381.  It was -- the history of
13  the '381 patent is there was an original patent application
14  filed in December of 2000 and then six patents have issued
15  from that so far.  There's other ones that may issue in the
16  future.  '381 is one of those patents that issued from that
17  original application and the disclosure that was done in the
18  middle of 1999 covers those inventions.
19      Another issue with Sakusabe is it's only a series
20  viewer.  He only calls his product a series viewer and he
21  says what happens is it displays a series of DICOM images
22  that are in a directory.
23      Now, in that article, Sakusabe also points out other
24  limitations that take it outside the scope of the '381
25  patent.  In his conclusion, he said:  "For a radiologist who

1    wants to use this for primary diagnosis, there is some lack

2    of performance."

3        He also said:  "We did not focus the issues of

4    acquiring, managing and selecting images, which is important

5    for any actual display system."

6        And again, that managing and selecting images is moving

7    them around with the thumbnails and being able to select

8    different series.  So he didn't address the same full scope

9    of the problem.

10        And so again, to summarize Sakusabe, it's not prior

11   art, it doesn't receive pluralities of series of images, it

12   doesn't have a pointer associated with a procedure, it

13   doesn't have thumbnails that represent series, and it

14   doesn't allow the navigation of the thumbnails in the series

15   to permit diagnosis.  So again, Sakusabe doesn't anticipate.

16        The obviousness argument in the briefs was lacking.

17   They listed a number of references, including some that

18   aren't prior art, and they've never really attempted to

19   correlate individual references to individual elements of

20   the claim or to provide you with any reason why you would

21   combine references to produce this invention.

22        Even if they had done this, though, the law provides a

23   number of objective factors of nonobviousness that the Court

24   can look at to determine whether or not the invention is

25   obvious; and those factors include whether there was a

1    long-felt need for this solution, whether people have taught

2    against it in the literature, whether there has now become

3    widespread acceptance of it in the industry, whether others

4    tried and failed, whether there's been copying, and whether

5    there's been commercial success.  I would like to just hit

6    on a couple of those from the evidence we've submitted.

7        As far as long-felt need, one of the articles submitted

8    by Merge's expert was written by Mr. DeJarnete around 2000

9    and he said "there has been much talk about the use of Web

10   technology in medical imaging."

11       Now, in addition to that, there were hundreds of

12   references that were cited of different attempts to try to

13   solve the issue of distributing medical images through the

14   Internet and 150 of them were examined during the

15   prosecution of the patent and another large number have been

16   provided by Merge in the -- during the process of this case

17   and all of those tend to show that there was a need for this

18   solution.  It's just nobody had either asked the right

19   question or come up with a way to solve it.

20       Teaching against.  Again, Dr. DeJarnete said:  "This

21   simple Web server-based teleradiology model...is unsuitable

22   for any application other than the transfer of an image with

23   a text report to referring physicians for record keeping

24   and/or patient consultation purposes."

25       He described the general outline of what we were going

1    to do, and then he said, "But you can't make it work.  It's

2    not suitable for diagnosis."

3       The Huang textbook that we cited also, which was dated

4    in 2004, said the web-based technology simply can't do this.

5       So there was -- let's see.  Let me just hit one other

6    one that was in the file.  In 2006, doctor -- Heart IT sent

7    some letters out to competitors inquiring about whether they

8    infringed the first patent at issue because they were

9    advertising things that were called web-based medical

10   imaging viewers.  He naturally thought maybe they were doing

11   something that was like a zero-footprint.

12      He sent a letter to Dynamic Imaging, which is one of

13   the competitors; and in 2006, their technologist wrote back:

14   "Any person skilled in the art and the industry of medical

15   imaging will confirm that functional capacity of a web

16   browser is not enough for building a fully featured

17   enterprise PACS for primary reading."

18      Again, when you translate that into the patent, they're

19   basically saying that this is not possible.  So they're

20   teaching against the idea that you could actually use a

21   simple browser-based format for medical diagnosis.

22      A few years later, though, the industry has accepted

23   it.  One of the -- this was a table that was from Dr. Judd's

24   affidavit.  He used the top ten competitors identified by

25   Merge's Mr. Tolle and went to the FDA database and looked to

1    see if they were -- when they decided to offer a
2    zero-footprint viewer.  All ten of them now are either
3    advertising a zero-footprint viewer or they have filed for
4    FDA approval for it, and this gives the dates.  Most of them
5    are in 2011 and 2012, starting with -- and they're starting
6    to hit the market because it's -- and I think that
7    demonstrates a general industry acceptance of this concept
8    of the invention of the patent.
9        And as far as copying and commercial success, Merge has
10   had a lot of commercial success with this.  If you look at
11   the Merge overview that was also in Judd Exhibit 34, they
12   claim a 61 percent market share of their interoperability
13   solutions; and if you'll note, the products that are listed
14   in there are Access, which is the zero-footprint viewer, and
15   then Share and Enterprise Archive.  Those are archiving
16   systems that will store the images and make them available
17   to be shared with other people.
18       But Mr. Tolle again helped us out there.  He said, "It
19   is my opinion that if Merge were enjoined from selling
20   iConnect Access and Honeycomb Image Sharing, Merge would
21   have great difficulty maintaining its present sales levels
22   for many of the products identified in paragraphs 37 and 38
23   above."
24       And the Share and Enterprise Archive are those products
25   that were among those products that were listed above.

1    And in terms of success, Mr. Tolle also testified that

2    these products are spectacularly successful.  They've had

3    tremendous sales growth.  I'm not going to quote the figures

4    because they were produced as "Attorneys' Eyes Only," but

5    Your Honor has the unredacted version of Mr. Tolle's

6    declaration.  It shows that it has grown rapidly since its

7    introduction in 2009 and the sales projection projected

8    sales growth is also rather remarkable.

9    When these objective factors of nonobviousness are

10   considered, we believe that the Merge's defenses of

11   invalidity are not going to prevail.

12   I'd like to move on to the next element, irreparable

13   injury, if the Court has no questions.

14        THE COURT:  You suggested that there was some

15   point in time that Merge, as you argued, became aware of

16   zero-footprint technology that you were using that prior to

17   that time that they were not using that.

18        MR. LESTER:  That's correct, Your Honor.

19        THE COURT:  What were they using, to show the

20   distinction between that and what they started using, after

21   2006 or in 2008 or 2009?

22        MR. LESTER:  They were using a product that did

23   require a download.  I believe it was ActiveX.  They've got

24   their technologist here.  It required extra software beyond

25   the web browser in order to display the images.  Then they

1  got religion and realized that the zero-footprint viewer was

2  the way to go and have been extraordinarily successful.

3  They were the first really large company in the industry to

4  embrace the zero-footprint viewer and market it as this

5  interoperability solution that makes it much easier for

6  people to put images into their system.

7          THE COURT:  Is there any difference in terms of

8  how a user gets access to the images from DICOM from what

9  you're doing and what they have done or started doing?

10         MR. LESTER:  The images have to be converted -- to

11  get into our system, they have to be converted on the server

12  side and sent to the user.

13         THE COURT:  But do you do this without any initial

14  request from the user?  Are you just pulling a group of

15  images down and hoping you get clients asking for them or is

16  it the client asks and then you start the process of

17  downloading?

18         MR. LESTER:  Oh, well -- well, it can go either

19  way.  The client can ask for the -- say I want -- he'll

20  navigate to the web page.  He'll pick up a patient.  He'll

21  say, I want to see the MR study.  And the system, if it

22  already has the images converted, it will send them to him

23  immediately.

24         THE COURT:  Is there any distinction between what

25  your patent calls for in that instance compared to what

1    Merge might have been doing or might be doing?

2              MR. LESTER:  Well, that's certainly an argument

3    that Merge is making.  They're saying they do theirs on the

4    fly, which means they don't do the conversion until the user

5    request comes in.  Our patent doesn't preclude that.  In the

6    specification, it says it's preferably done automatically

7    before the user requests it, but it doesn't say that it has

8    to be done automatically.  It certainly leaves open -- the

9    claim is written in such a way --

10             THE COURT:  But does your patent say that's not

11   necessary as a part of what we do; that there is no "on the

12   fly" or if -- put it this way:  If someone is using on the

13   fly, that does not infringe on our patent.

14             MR. LESTER:  No, it does infringe on the patent.

15             THE COURT:  And I'm asking you to explain how that

16   happens.

17             MR. LESTER:  Okay.  Well, the patent describes

18   that it needs to be converted before it gets transmitted.

19   It doesn't say it has to be converted before it gets

20   requested, which is the spin they're trying to put on it.

21   The patent -- the critical difference between our patent and

22   the prior art is our patent does the processing on the

23   server side.  So it converts the image on the server side

24   before it gets sent to the user.

25        The conversion can occur before or after.  It doesn't

1    matter when -- whether it's before or after the user has

2    requested it.  And, in fact, in the specification we

3    describe a system that is a real-time system, where the user

4    just logs on and the images are streamed to him as the

5    procedure is being done.  Now, that's obviously --

6           THE COURT:  So there's no delay.

7           MR. LESTER:  Well, there's just the delay of

8    getting the images processed and then they just stream to

9    the user.  So there isn't even a request.  So if your

10   definition is you have to wait -- you have to process it

11   before someone requests it, this is -- on the real-time

12   system, the request happens first and then the processing

13   occurs later while the -- while the procedure is being

14   undertaken.

15       Again, we can also go into the details.  The flow

16   charts that show how the system operates don't put a

17   restriction that says that the conversion of images has to

18   occur before the user requests.  If you look on Figure 3 of

19   the patent, the user request is number 200 and there's no

20   limitation before that.  There's nothing that says that all

21   these conversion steps that are on the left side of the page

22   have to occur before the request.  The user request is just

23   floating up there.  It can occur before that conversion

24   occurs or after.  There's no restriction that limits it to

25   that sequence, unlike Figure 1 which is the -- describing

1  the prior art. In the prior art, it says the user request
2  has to occur and then the conversion will happen.
3          THE COURT: All right, sir.
4          MR. LESTER: So let me move to irreparable injury.
5  The legal test that we described in the briefs includes
6  several factors: a substantial amount of competition in the
7  field; large presence by the Defendant; the patent could
8  help the Plaintiff establish a market position and establish
9  business relationships; the potential injury is
10  unpredictable; and in the absence of the injunction, other
11  potential infringers would be encouraged to infringe.
12      We think the *Hybritech* case is spot on in this
13  situation and so I would like to just go quickly through the
14  evidence we have for those elements.
15      I come back to this table of top 10 competitors to show
16  there's a substantial amount of competition in the field. I
17  don't think Merge is going to argue that there isn't a lot
18  of competition in the field. Mr. Tolle said that over and
19  over again in his testimony.
20      Defendant has a large presence in the field. This is
21  where we sort of differ. Merge says they don't have a large
22  presence, but in our experience they do. They -- and in
23  their report to their investors, they again claim the 61
24  percent market share of interoperability solutions and a
25  large number of clients. They are taking the first move or

1    advantage as a large company that's a stable company that
2    has a good marketing presence out there and they're usurping
3    the position that Heart IT believes it should have.
4        Could the patent help the Plaintiff establish a market
5    position and create business relationships.  That was the
6    essence of our business plan and that's -- in 2010, Dr. Judd
7    and Heart IT submitted a business plan as part of an NIH
8    grant; and they described how they were going to use their
9    proprietary technology to gain a foothold in the market and
10   use it to expand the use of zero-footprint technology.  That
11   was the plan.  It actually worked.
12       In 2010 when they competed against Merge at St. Vincent
13   Hospital in Indianapolis -- Merge and several other
14   competitors were bidding against Heart IT, all these big
15   companies against little Heart IT, and Heart IT won that
16   bid.  They were able to install their system there.
17       However, in the meantime, Merge switched over to a
18   zero-footprint system.  They went back to Ascension
19   Healthcare, which is Heart I -- which is St. Vincent's
20   parent company, and now they're the preferred vendor for all
21   of the 500 hospitals of Ascension and Heart IT has been
22   notified that they're not going to get their contract
23   renewed at St. Vincent's.
24       The big difference between the first one -- the first
25   solicitation in 2010 and now in 2013 is that Merge has

1    established itself as a zero-footprint viewer.

2              THE COURT:  Are there other factors associated

3    with Merge's product that made it more marketable than just

4    zero-footprint technology?

5              MR. LESTER:  It certainly had other attributes,

6    but Heart IT's product is full-featured and beat out the

7    Merge products in 2010.

8              THE COURT:  So they didn't add anything new, other

9    than zero-footprinting, that allowed them to be a more

10   competitive source for you?

11             MR. LESTER:  Not that we're aware of, sir.  We

12   weren't involved in the procurement or in the process.

13   It's -- but from what we've heard -- and Mr. Perez is here

14   to testify if you want to hear it -- the folks from

15   Ascension said that the zero-footprint was an important

16   factor in the decision to move over to Merge.

17        I think I mentioned Mr. Hiram Perez is the vice

18   president of sales for Heart IT and he's here also.

19        The next factor is whether the potential injury is

20   unpredictable.  Dr. Judd mentioned several things in his

21   declaration that pointed out the intangibles with relation

22   to losing contact with some of these customers.  Extensive

23   communication with the customers helps you develop your

24   future product line, and the loss of the communications with

25   the folks at St. Vincent and Ascension is going to impair

1    our ability to be competitive in the future.

2        Also, other factors that were mentioned that have been

3    discussed in a number of the cases were loss of market

4    share, loss of goodwill, and loss of brand recognition; and

5    we feel that the loss of market share to Merge as a result

6    of this infringement is going to irreparably damage the

7    company.

8        And the final factor from *Hybritech* is:  In the absence

9    of the injunction, other potential infringers would be

10   encouraged to infringe.  We feel like they feel encouraged

11   right now.  We would like to turn that one around and say if

12   we get the injunction we will certainly be able to

13   discourage them from continuing to expand into the

14   zero-footprint market.

15       The next factor is balance of the hardships.  This is a

16   classic case where balance of the hardships should be

17   considered.  The size of the parties, Merge is about a

18   hundred times the size of Heart IT.  The products of the

19   parties are in direct competition, except Merge has a lot of

20   other products beside the zero-footprint viewer and the

21   associated products, and the revenue sources of the parties.

22       Let's just do a quick comparison.  Heart IT revenues of

23   3 million and 17 employees.  The zero-footprint viewer is

24   the heart of its product line and affects a hundred percent

25   of sales.  Merge, in their filing with the FCC, they said

1    248 million last year, 860 employees.  iConnect Access is

2    part of a diversified product line that they have and it

3    accounts for less than 3 percent of their gross sales.  The

4    sales of all related products that they've listed back in

5    that 61 percent item is less than 15 percent of their gross

6    sales.  So it might be a hit, but it's not like the hit that

7    Heart IT takes when it loses sales of its zero-footprint

8    viewer.

9        And finally public interest.  The Court is going to

10   have to balance the rights of the patentee against the

11   rights of the public.  We'd like to make that an easy job

12   for you.  We're seeking a narrow injunction.  We don't want

13   to affect any of Merge's current customers.  We only what to

14   enjoin advertising and new sales on the Accused Products.

15   And we feel, as we mentioned in the briefing, Merge can

16   substitute their old non-zero-footprint viewers that are

17   already FDA approved.  We feel like if they wanted to

18   continue selling their combined products they could put one

19   of those viewers on top of their archiving systems.  So we

20   feel like it would have no substantial impact on the public,

21   but it would enable Heart IT to stay in the market.

22            THE COURT:  All right, sir.

23            MR. LESTER:  Thank you, sir.

24            THE COURT:  Yes, sir.

25            MR. TRUAX:  Good morning, Your Honor.

1    THE COURT:  Good morning.

2    MR. TRUAX:  It's Terry Truax on behalf of Merge

3  Healthcare.  Your Honor, again thank you for your time and

4  your patience in hearing us this morning.  I would like to

5  respond to Mr. Lester's comments and also address very

6  specifically the issues that are in front of the Court

7  today.  Before I do so, Judge, I thought it would be

8  helpful, Your Honor, to give you just a brief overview of

9  who Merge is.  Some of that's presented in the papers, but

10 just to get a sense of it.

11   Your Honor, Merge is incorporated under Delaware laws,

12 as alleged in the complaint; and it's a company that has as

13 its mission to develop software solutions that facilitate

14 the sharing of images to create a more effective and

15 efficient electronic healthcare experience for both

16 physicians and patients.  It's an enterprise -- what they

17 call enterprise imaging company, if you will, healthcare

18 imaging company.  That's a fancy marketing word; but at the

19 end of the day, they help deliver imaging solutions and

20 generally -- solutions generally to the -- to the healthcare

21 market; and we're going to talk about that in my

22 presentation, which comes out of the papers that Mr. Tolle,

23 who I will introduce in a moment, has presented to the

24 Court.

25   Your Honor, Merge is headquartered in Chicago.  It was

1   incorporated back in the late '80s, but over the years has

2   acquired other companies, including importantly -- and we'll

3   get to this -- a company called Amicas at one point.

4   Actually, a company called Amicas, which owned a company

5   called Emageon.  And Emageon is spelled E-m-a-g-e-o-n.

6       And the reason I mention that, Your Honor, is because

7   one of the customers, just to cut to the chase here, that

8   Heart IT alleges somehow they lost an opportunity with is

9   Ascension. You just heard Mr. Lester mention that.  Well, in

10  fact, what Heart IT fails to present to the Court -- and

11  there's an utter deficiency in their papers, and we'll talk

12  about that burden and the deficiency in a moment -- was why

13  Ascension would switch.  Right?

14      First, it presumes that Ascension did switch.  In fact,

15  Ascension was a legacy Merge customer.  That means they were

16  an existing customer on all kinds of products.  And

17  secondly, Your Honor, Ascension had an equity investment in

18  Emageon at one point, which was later acquired by Amicas and

19  then later acquired by Merge.  So the idea that somehow

20  Merge has somehow come in here and stolen, which is the --

21  which is the inference and the suggestion, the Ascension

22  business from Heart IT is absolutely completely unsupported.

23          THE COURT:  Well, they had some reason to go to

24  them for a product that was not previously available to them

25  using the zero-footprint imaging --

1          MR. TRUAX:  That is correct, Your Honor.

2          THE COURT:  -- even though they might have had

3   some connection with your predecessor.  They did that of

4   their own volition.

5          MR. TRUAX:  That's correct, Your Honor.  We'll

6   talk about the market because I think as Your Honor

7   evaluates the market and the issue of irreparable injury

8   it's very important that the Court understand the

9   multilayers of this market and how the market works.

10         Let me as a starting point, Your Honor -- before

11  jumping to that, let me first make sure Your Honor has been

12  introduced.  This is Mr. Tolle, who is a senior vice

13  president of strategy and development for Merge.  He is a

14  very senior executive of Merge and is based in Chicago, came

15  here today for the hearing, Your Honor.

16         In addition, behind me in the back here is Mr. Atul

17  Agarwal.  Mr. Agarwal is the chief IT officer effectively.

18  He has got a slightly different title, but effectively is

19  the chief information technology officer for Merge.  Your

20  Honor, Mr. Agarwal, who submitted a declaration in

21  opposition to the PI, is based in Toronto, in Canada; and he

22  came in to court today also to be here to answer any

23  questions that the Court may have.

24         Your Honor, you'll also see from the papers that we

25  submitted, actually submitted by prior counsel, but that

1    Merge submitted in opposition to the PI, there was an expert
2    by the name of Dr. George Shih.  Dr. Shih is on the faculty
3    at Cornell Medical School in New York City; and for various
4    reasons, he had a conflict today and couldn't be here.
5         But irrespective of that, Your Honor, we had before --
6    long before we knew of this hearing being scheduled and long
7    before we knew of Dr. Shih's conflict, frankly, we had
8    engaged Dr. David Clunie, who is a world-renowned expert on
9    imaging; and Dr. Clunie has submitted declarations already
10   in this case on the issues of claim construction, which the
11   Court has in front of you, albeit not on the PI papers.  We
12   did submit a supplemental declaration last night.
13             THE COURT:  Well, let's not waste time on that
14   because I've indicated I'm not going to consider it.
15             MR. TRUAX:  Yes.  I understand, Your Honor.  I
16   just wanted you to know who he is and why he's here, Judge.
17        So, Judge, this is a preliminary injunction proceeding;
18   and Your Honor, of course, has experience with that and
19   great experience.  You know, the Court -- this Court has an
20   array of powers before it; and some of the most
21   extraordinary powers that a Court has is to deprive somebody
22   of liberty following a procedure, a process at trial; but an
23   equally -- almost equally powerful tool that a court has is
24   the tool to enjoin a party from doing something, to enter an
25   injunction.  It's a serious remedy.  Your Honor is familiar

1    with the plethora of case law from the Supreme Court down
2    through the Fourth Circuit, through the Federal Circuit,
3    through every circuit about why --
4              THE COURT:  We can make that assumption and move
5    on.  That's why I'm here.
6              MR. TRUAX:  Yes, Your Honor.
7              THE COURT:  Move on.
8              MR. TRUAX:  The elements -- and I would just like
9    to put up briefly -- I don't know if we could get the slide
10   to show up.  Your Honor, we also have a few slides.
11        If you could flip to the next page.
12        Your Honor, there's a few elements.  I just want to
13   make sure we're oriented on them.  We -- the Plaintiff, that
14   is, Heart IT, must show that there's a reasonable likelihood
15   of success on the merits.  They have to show irreparable
16   injury in the absence of a preliminary injunction.  They
17   have to show that there's a balance of hardships tipping in
18   Heart IT's favor and ultimately they have to show that the
19   injunction's favorable impact on the public interest
20   outweighs the burdens and hardships on others.  And that's,
21   of course, standard case law that Your Honor is familiar
22   with.
23        There's a few other points of law here that are
24   relevant, I think again to orient us.  As Your Honor just
25   recognized, the preliminary injunction is a drastic and

1    extraordinary remedy, not to be routinely granted.  And this

2    is important, Judge, what is the burden in this proceeding

3    because at a trial -- when we get to a trial on the merits,

4    the Plaintiff has the burden of proving infringement by a

5    preponderance of the evidence.  As a defendant, if I want to

6    prove invalidity at trial, I have a burden; and that burden

7    at trial is to prove by clear and convincing evidence that

8    the patent is invalid.  But that, Your Honor, is not the

9    burden at this PI stage.  The burden at the PI stage that

10   the Federal Circuit has repeated over and over again is that

11   a preliminary injunction cannot issue if a nonmoving party

12   like Merge raises a substantial question concerning either

13   infringement or validity.

14        So, in other words, if we assert an infringement

15   defense or invalidity defense, if the patentee cannot prove

16   lacks substantial merit, not that we're going to win but

17   just simply they have to -- if they cannot defeat the fact

18   that our claim has at least some merit to it, some

19   substantial merit, the preliminary injunction must fail.

20        So, Your Honor, at the preliminary injunction stage,

21   because of the extraordinary relief -- of the nature of this

22   relief, as Your Honor knows, it's the Plaintiff, the moving

23   party, that bears the burden at every stage.  It doesn't --

24   they don't get relieved from that burden somehow.

25        And, Your Honor, that's a change in the law in the

1    patent context.  It used to be in many of the cases -- in

2    fact, the *Hybritech* case that Mr. Lester points to is a 1988

3    case; and while I'll concede that the elements that are

4    recited in *Hybritech* are generally good law, I think it's

5    important to understand that *Hybritech* was decided prior to

6    the Supreme Court's decision in *eBay*.  And there's a whole

7    legion of cases decided prior to 2006 in the patent context,

8    Judge, where somebody -- where if a plaintiff could come in

9    and if they could presume -- if they could demonstrate a

10   likelihood of success on the merits of infringement and

11   validity that irreparable injury was presumed.  That's no

12   longer the law, as Your Honor knows.  After *eBay* --

13           THE COURT:  Well, why try to confuse me now with a

14   recap of what the law was?  Let's move on.

15           MR. TRUAX:  Okay.  Your Honor, I respectfully

16   suggest that Merge cannot meet its burden as we've

17   articulated it in the briefs and here before the Court.

18       The '381 patent, one of the three patents they've

19   asserted, is not infringed, and we have raised -- and I

20   believe it's raised in our papers and I'll be happy to

21   amplify on it or answer any questions the Court has this

22   morning and we have Mr. Atul Agarwal here to answer any

23   questions the Court has about how Merge's products work.

24   But they can -- there's a substantial question, a fair

25   question about the merit of our claim as to whether or not

1    we infringe.  We don't infringe and we'll walk through with

2    the Court why we don't infringe.  And for that reason alone,

3    that first prong, they cannot establish that there's a

4    likelihood of success on the issue of infringement, they

5    lose.

6         Secondly, they have to show again that there's no fair

7    substantial question that our patent -- that their patent is

8    invalid.  Now, we've offered the Court the Feingold

9    reference and the Sakusabe reference, and there's a

10   reference buried in those or incorporated in those two

11   references, the so-called Grevera reference, as well.

12        Now, Your Honor, those references -- Feingold,

13   Sakusabe, Grevera -- they were not before the Patent and

14   Trademark Office when this was issued.  Dr. Judd, who

15   prosecuted this patent with his lawyers, never submitted the

16   Feingold reference because he didn't know about it and so

17   as -- and we'll talk about the Feingold reference shortly,

18   but that reference was never before the patent office before

19   this '381 patent was issued.  So there is a fair question

20   not only of noninfringement. There's a fair question that

21   the patents are anticipated or obvious ultimately by

22   Feingold and others.  So on those two bases alone that

23   should end the inquiry here.

24        Your Honor, let me pause for a moment because I want to

25   go back to the issue of burden and on these first two issues

1    of noninfringement; and I think, you know, to cut to the

2    chase in terms of proof, the papers that were submitted --

3    and I understand Your Honor is restricting us to the papers

4    that were submitted -- by the Plaintiff included two

5    declarations in the opening PI.  One was a declaration from

6    Dr. John Grizzard, G-r-i-z-z-a-r-d, as well as Dr. Judd; and

7    Your Honor perhaps has read those papers.

8         In fact, Mr. Lester this morning referred to

9    Dr. Grizzard multiple times as supporting their reason why

10   we infringe, multiple times.  I didn't count them up, but

11   there must have been 10, 12 times in the record about how

12   Dr. Grizzard said this and Dr. Grizzard says that.  We

13   deposed Dr. Grizzard, after some reluctance in producing

14   him, yesterday and Dr. Grizzard in his deposition tells us

15   that he's not an expert.  He's not an expert in computer

16   software.  He's not really an expert in any of those issues

17   to be able to opine on anything and, in fact, Dr. Grizzard

18   is not here today.

19        So, Your Honor, on that basis alone, where they have

20   the burden of proving infringement, that they have the

21   burden of likelihood of success on the merits, their own

22   doctor that offered up their allegations of infringement

23   tells us when deposed under oath that he's not really an

24   expert at all on these issues that are present before the

25   Court.  Now, that I suggest, Your Honor, that by itself

1    creates failure and creates a reason for the Court to

2    summarily deny this motion.

3        But beyond that, Your Honor, beyond the issue of their

4    ability to prevail on the evidence they presented on

5    infringement and invalidity, of which we again think there's

6    absolutely fair questions, they also cannot show

7    irreparable harm.  And, in fact, when you look at the

8    irreparable harm -- and we'll talk about this and I'm going

9    to give you some facts to support this coming out of some

10   of these declarations that have been filed -- the injury

11   here -- the potential injury weighs heavily in favor of not

12   only Merge but other customers.

13       The injunction they sought in the papers, when you look

14   at it, talks about enjoining Merge from selling its iConnect

15   suite of products.  Well, the iConnect suite, Your Honor, as

16   you're going to hear and I'll explain shortly when we talk

17   about the products, doesn't include just the Access product,

18   which is the viewer that I'll explain visually for you, but

19   it also includes another suite of products.

20       And Your Honor asked, I think, the question cutting

21   directly to that question.  There are products.  There's

22   something called the vendor neutral archive or VNA.  And

23   I'll talk to you about what a VNA is.  But a VNA is

24   something that allows the system to be interoperable.  And

25   we'll talk about what that means, but that's not -- they're

1    not complaining about the VNA, but, in fact, if you enjoin

2    the product that they want enjoined, you'll be enjoining us

3    from selling our VNA product.  That, Your Honor, would

4    create significant irreparable injury with no relationship,

5    frankly, to the '381 patent at all.  So when you look at

6    irreparable injury, we believe they'll fail on that level as

7    well.

8         And then finally, Your Honor, when you look at the

9    balance of hardships and public interest, we're talking

10   about a preliminary injunction where we're scheduled to have

11   a trial 12 months from now.  The disruption that would occur

12   to existing contracts, even with the now more narrowed

13   limitation that Heart IT is presenting to you today, which

14   is, of course, a retreat from the papers that were

15   originally presented -- but even with that more narrow

16   relief that they're seeking today, it would create

17   significant disruption both for Merge and also for

18   third-party customers.

19        Your Honor, let me move and take these elements on.

20   I'll attempt to do it briefly and certainly be prepared to

21   answer any questions the Court has.  I don't want to belabor

22   it, but I do think there are some elements to understand.

23        I'm sorry.  If you'll go back to Slide 5, please.

24        Your Honor, the claim terms that come out of the '381

25   patent that we believe require construction include this

1  first bullet point: "Without requiring software that is
2  executing outside the Internet web browser." And I'm going
3  to explain that for you because it's a lot of, frankly --
4  and I say this respectfully -- patent gobbledygook, I'll
5  call it, in some respects. It's patent claim language that
6  sometimes can be very confusing to read, but I'm going to
7  walk you through it so it's clear. That's one claim term to
8  be construed. What does it mean when the patent claims
9  "without requiring software executing outside the Internet
10 web browser"?
11      Secondly, Your Honor, as we said in the PI papers, we
12 have to -- we have to construe this claim. What does it
13 mean when they talk about a format that's incompatible,
14 sometimes refers to a format that is compatible, with
15 displaying in an Internet web browser? What does that mean?
16 And Your Honor has asked some questions of Heart's counsel
17 in the opening presentation on that issue.
18      Your Honor, there were two other issues that we
19 referenced in some of these supplementary papers. I am not
20 going to spend time on the pointer issue because Your Honor
21 has directed me not to. I've raised that issue in some of
22 these supplementary papers. I'm not going to belabor that.
23 "Before being transmitted" point was a question you asked
24 Mr. Lester and I would like to address that briefly in our
25 presentation.

1        Peter, if I could ask you to flip, if you would, to the
2    slide at page 13.
3        Your Honor, I think to get a handle on claim
4    construction -- to -- Your Honor, in order to assess whether
5    or not we infringe Heart IT's patent, you have to start with
6    this claim construction exercise.  Now, let me stop for a
7    minute.  Mr. Lester has put up a picture of how the Heart
8    product works and other things.  This case, this motion is
9    not about Heart's product.  That's not what this case is
10   about.  This case is about Heart's patent, the '381 patent.
11   And in Congress, as you know, we -- the Constitution
12   enshrines this idea that we give parties the opportunity to
13   have a patent, a monopoly to be able to practice an idea;
14   but you're limited in that monopoly by the metes and bounds
15   of the patent, by the claims.  You don't get to expand the
16   scope of your patent beyond -- or your invention beyond the
17   claims.
18       So therefore, Judge, we believe it's essential for the
19   record and for the Court to understand what is it that
20   they're claiming in the context of these two particular
21   terms or three:  What does it mean to execute software
22   outside the browser and what does it mean to have a
23   browser -- or to have an image that's browser compatible and
24   how do you reconcile those two terms in the context of the
25   patent that Heart IT applied for, prosecuted, and presented

1  to the Patent and Trademark Office.

2      So we want to walk you through that.  Let me just make

3  sure you -- that the Court has the benefit of some of the

4  language and lingo here.  You're going to hear something

5  called a PACS in a medical image system.  Judge, this is a

6  medical image system.  There are imaging devices, scanners,

7  you know, that scan and scan an image and then store it in

8  storage and that ultimately -- those images are then

9  displayed on workstations.  An example of a workstation,

10  Your Honor, an image workstation, would be something of

11  what's displayed here.

12          THE COURT:  Let's not be so elementary.  This is

13  not my first patent case in my 19 years of being on this

14  court.  Your tone seems to continually suggest that you need

15  to educate me.  Let's get to the patent, the questions at

16  issue.  Don't try to educate me at this point.

17          MR. TRUAX:  Okay, Your Honor.  Certainly.  And I

18  apologize, Your Honor.  I certainly am not -- I want to be

19  respectful of the Court's time and I'll certainly move

20  along.

21      I was prepared to explain -- if you could flip to the

22  next slide.  I'm sorry.  Slide 15.  There's a web browser --

23  "what is a web browser" slide.

24      Your Honor, I think Your Honor is familiar with web

25  browsers.  Obviously, there's a whole host of them.

1        THE COURT:  Again, don't belittle my knowledge of

2    computers and Internet browsers by being that basic.

3        MR. TRUAX:  Okay.  Well, Your Honor, I think one

4    thing that frankly -- and I'm a patent lawyer.  I had to

5    have some explanation -- if you'll flip to the next slide --

6    how does a web browser work.  I think that's the core to

7    this patent, how does this web browser work and what does

8    the term "browser compatible" mean.

9        And Your Honor may be familiar with this, but the way a

10   browser works is there's -- for example, the Middle District

11   of North Carolina has a web page.  There's content on that

12   web page.  That web page, Your Honor, is written with script

13   and other things that then delivers that content via -- via

14   the means over the Internet to a browser.  So that's how the

15   Internet -- the Middle District of North Carolina website

16   works.  There's content written on the server -- at the

17   North Carolina website server that's then delivered over the

18   Internet to a browser that somebody can then look at.

19       Then flip to the next slide.

20       And so what is a web page.  Your Honor, a web page is

21   made up -- that Middle District of North Carolina web page

22   is made up of various things.  There's something called html

23   and there's something called -- there are images and media

24   and something called scripting languages that go into this.

25   There's something called applets and plug-ins, and all of

1    those things -- if you'll flip to the next slide --
2    constitute what goes in.
3        Let me just give an example.  The way you take -- use
4    something called html, Your Honor, is html is what they
5    call a markup language that's used and written in the text.
6    It will then -- you can look on this slide.  It will tell
7    you -- html, you know, will tell you to write the color
8    green and hello world, and it does that.  And, Your Honor,
9    the same thing -- if you pull up the next slide -- if you
10   want to display an image, for example, you can tell it to
11   take this image SRC and display an image.
12              THE COURT:  You're wasting my time.
13              MR. TRUAX:  Okay.  I apologize, Your Honor.  Then
14   I'll move on.  So let me -- let me move on then to the issue
15   of the term here, specifically what is meant by -- you know,
16   well, what is a DICOM image.  I think, Your Honor, you asked
17   that question.
18        And if I could ask you to flip to Slide 26.
19        Your Honor, this is a DICOM image here and a DICOM
20   image is basically an image in a format like any other
21   format, but this particular format has a lot of data in it.
22   It has two basic components.  It has what we call a header
23   and it has pixel information and that is a --
24              THE COURT:  The Court asks questions sometimes to
25   help move an attorney along, not to suggest the Court is not

 1    familiar with what the language is, so don't misinterpret

 2    why I ask a question.

 3              MR. TRUAX:  Yes, Your Honor.  Okay.  If I could

 4    ask -- so what did Heart IT claim here, Your Honor?  And

 5    if you look at figure -- if you look at the patents

 6    themselves -- and if I could ask my colleague to put up

 7    Slide 28.  Your Honor, Figure 1 on the left, which is the

 8    prior art, and Figure 3 on the right is what is claimed.

 9    And I think this is critical because again when we're

10    talking about the metes and bounds of the patent, what did

11    they claim here.

12              THE COURT:  Just for your information, I have both

13    of those figures in front of me.

14              MR. TRUAX:  Okay.  Your Honor, again, I want to be

15    respectful of the Court's time.  Would it be helpful for me

16    to go through this or --

17              THE COURT:  You can explain it as you choose to do

18    with respect to what's there, but I have it in front of me.

19    Whether you want to refer to it from up there, that's fine.

20    Just go right ahead.

21              MR. TRUAX:  Okay.  Your Honor, I think it's

22    critical to understand that Figure 1 on the left, this is

23    the prior art; and there's multiple places in the

24    specification -- and again the specification is what the

25    patent applicant says to the Patent and Trademark Office in

1    order to get his patent, where the patent applicant tells

2    the patent office that their patent -- their invention is

3    different from the prior art because their invention, Judge,

4    disclaims all sorts of user interaction.

5        As you can see in Figure 1, if you look at it, the

6    way this Figure 1 is displayed, it talks about a user

7    requests -- user makes a request for a single image.  And

8    that image has already been scanned in Figure 1 and so the

9    image is then read into the database.  And then if you look

10   again at Figure 1, the images are then converted to a web

11   convertible -- a web-compatible format.  But then it comes

12   down and -- if you'll see in the last box at the bottom,

13   importantly, it talks about the user adjusts the brightness,

14   the movie speed, the magnification, et cetera.  It does all

15   of those things.  And then to the left -- you'll see here on

16   the left-hand side of the screen it talks about the user has

17   to wait.

18       Now, what do they mean by that?  I mean, what does that

19   say?  Well, the -- the -- in the specification, if you go to

20   the patent itself -- and if I could ask my colleague to flip

21   to this slide here.  This is some language from the

22   specification and specifically, Your Honor, it comes from

23   column 6, lines 64 to 65.  And if you see the way that

24   happens, all that user interaction with brightness, et

25   cetera, here in the patent they talk about -- first they say

1    the responsibility for that entire process is divided among

2    a series of software engines; and then in the next column,

3    in column 7, they go on to explain one of those engines,

4    something called the physiologic knowledge engine, which is

5    basically an engine that predetermines the type of images

6    that somebody would want to look at.  That's what this

7    patent ultimately was about.  But that this physiologic

8    knowledge engine is responsible for adjusting image

9    brightness and contrast, adjusting image magnification,

10   adjusting the movie frame speed, and other issued parameters

11   important for diagnosis.  It wasn't going to be the user.

12       If I ask you to look at column 3 -- going back to

13   column 3, line 16, they made this very, very clear in the

14   specification.  They made this point that "diagnostic

15   interpretation of the medical images requires the images are

16   presented with appropriate brightness and contrast."  And on

17   proprietary workstations, they said "these parameters can be

18   adjusted by the person viewing the images but control of

19   image brightness and contrast are not features of current

20   Internet standards (such as, for example, http or html)."

21       And they went on to say -- just below that, they said

22   in column 3, lines 18 to 20:  "It is possible to allow

23   browsers to adjust image brightness and contrast, as well as

24   other parameters, using Java," this programming language of

25   Java.  But they then went on to say that's not a good idea;

1    that's a bad idea.

2         As we've explained in the briefs, Judge, at page --

3    column 3, lines 26 to 39, they go on in the patent itself

4    and they explain that Java has got all these limitations,

5    lots of limitations, and they lay out these four reasons

6    why.

7         Ultimately, Judge, what they're saying here -- and if I

8    could ask my colleague to go back to Figure 1 and Figure 3

9    on page 28.  So on the left-hand side of this figure, Judge,

10   they're saying all that user control that's embedded in

11   there creates wait time.  So we've got a different idea and

12   the different idea that we have is this idea of no user

13   interaction, right, no user interaction and no "on the fly"

14   processing, in response to Your Honor's question.

15        Now, Mr. -- Heart IT's counsel references the issue of

16   "on the fly" processing.  Your Honor, the patent couldn't be

17   more clear.  I mean, there's a lot of cases that talk about

18   where a patent applicant disclaims certain things.  This is

19   about as good a disclaimer case, Your Honor, respectfully,

20   as I've seen.

21        If you look again back starting -- and we can start in

22   any number of places; but, for example, in column 3 -- and I

23   put these two up here for the Court to see quickly.  But in

24   column 3, lines 44 to 46 and then again at lines 59 to 61,

25   the applicant said -- the applicant was distinguishing Wood

1    because what happened in Wood -- that was a prior art

2    reference that the patent office had rejected all of Heart

3    IT's claims based on Wood.  The patent office said, You

4    haven't come up with anything inventive because of Wood.

5         And they said no, no.  "The approach of Wood, however,

6    creates Web Pages 'on the fly,' meaning that the user must

7    wait for the image processing to complete."  And then they

8    say down below, as you can see again at lines 59 to 61, as

9    can be seen in Figure 1, "serial processing of image data

10   'on the fly' combined with extensive user interaction

11   results in a slow, expensive, and unstable system."

12        So what did they come up with?  They came up with -- if

13   we go back to Figure 3, they came up with the solution

14   that's in Figure 3.  There's no -- a process that didn't

15   involve any -- it involved limited, if any, user

16   interaction.  In fact, if you read this, you'll see, Your

17   Honor, that the patent calls for preconverting these images.

18   That's what the diagrams say.

19        And if you look here in Figure 3 at the left-hand side,

20   it talks about no user interaction; and in the box toward

21   the bottom there, it says all images of the patent (sic) are

22   assembled into a single web base -- web page; and then to

23   the right there, all the image data for the patient is

24   downloaded, but the user waits minimal time because the user

25   is not requesting anything "on the fly."  Everything in

1   Figure 3 has been preconverted, so it's all preconverted in

2   there and there's nothing done "on the fly."  Your Honor,

3   that's not how --

4           THE COURT:  And that was the point of my question

5   to Mr. Lester.  Have they downloaded or created as a part of

6   the first process images for unknown patients that are

7   probably in the market area where the user might be and the

8   user doesn't have to say, "Well, give me Mr. Jones."  It's

9   already there.  In the process of "on the fly," you have to

10  wait for that process to then download those images and then

11  convert them.  Is that the distinction to be made?

12          MR. TRUAX:  I think you -- you seize it correctly,

13  for the most part, Judge.

14      The patent -- this patent and the specification for

15  this '381 patent is nearly identical, slightly different but

16  basically the same specification, as it has to be in order

17  for them to claim priority back to this earlier patent, but

18  the same specification as the other two patents that are

19  part of the complaint before the Court.

20      All of these patents essentially claim this idea that

21  we're going to -- instead of doing "on the fly" processing,

22  which they specifically disclaimed, very clearly disclaimed,

23  Your Honor, what they're doing is they're saying, "You know

24  what?  We're going to build an engine," these engines --

25  these processor engines that they talk about in the

1    specification, "and we're going to let those engines do all

2    the work for us."

3        Instead of having, you know, Dr. Truax, if I were such

4    a doctor, to sit there at the computer and adjust image

5    brightness and adjust all these things, because that

6    requires Java, which runs outside the browser, they say, to

7    do that, what we're going to do is we're going to preconvert

8    all of that.  We're going to use this fancy knowledge

9    engine.  We're going to run all these calculations and we're

10   going to preconvert this image and we're going to give you

11   various images of what you might want.

12       So when somebody requests that image, they don't have

13   to go through and process it right then because that will

14   take more processing time.  The image is already

15   preconverted.  So then at that point it is just a question

16   of delivery of the preconverted image over the Internet, as

17   opposed to a system, Judge, where I am sitting down at the

18   workstation and I say, "You know what?  I'd like to look at

19   this particular image of a femur" or a bone of some sort.

20   That's got to process it on the fly.  "And you know what?  I

21   want to magnify it.  I want to make it bigger."  That

22   requires another signal to the -- to the -- another message,

23   another conversion process to magnify it again.  "In fact,

24   now I want to zoom in or I want to get more contrast."

25   Another conversion exercise.  That, Your Honor, specifically

1    is what is taught against by this patent.

2         THE COURT:  But that would be the case in the "on

3    the fly" method --

4         MR. TRUAX:  Absolutely.

5         THE COURT:  -- to do that each time.

6         MR. TRUAX:  That's right, Your Honor.  Each time

7    that somebody sits down at a Merge workstation -- and, of

8    course, the technology is evolving dramatically, right,

9    which I think -- and I won't digress at this point, but the

10   whole issue of web-browser compatible is -- is I think now

11   antiquated because DICOM, which may have been not browser

12   compatible at one point is absolutely browser compatible

13   today, but we'll put that to the side.  The imaging -- the

14   "on the fly" processing which is done in the Merge product

15   is absolutely disclaimed in this figure.  If you look at

16   Figure 3 carefully, that's absolutely what's disclaimed.

17      Now, today Heart IT says, "Oh, no, we -- this was our

18   preferred embodiment, but we weren't excluding other things.

19   We weren't excluding things. You know, 'on the fly' -- 'on

20   the fly' processing, we weren't excluding that."

21      Well, respectfully, Your Honor, I don't think you

22   can -- you can't read the claims and ignore the

23   specification in the file history, et cetera.  You have to

24   read it in light of the specification and, respectfully, the

25   specification teaches absolutely that they have disclaimed

1    "on the fly" processing.

2        So, Your Honor, why does all that matter?  Well, it

3    matters because our product doesn't do what Figure 3 says,

4    right?  It doesn't do it and, frankly, nobody does that

5    anymore because the technology has surpassed Figure 3.

6    It -- this was -- this technology in Figure 3 that was

7    envisioned was maybe a good idea at the time, but it

8    anticipated that web browsers and technology would remain

9    static in 2000.  Well, it didn't.  Web browsers today are so

10   much more powerful than they were.

11       For example, Judge, one of the -- the key issue here is

12   is a DICOM image browser compatible or not.  That's one of

13   the terms Your Honor has to construe.  Is it?  The patent

14   doesn't -- and this is important.  The claim language

15   doesn't say -- they don't claim DICOM.  They don't claim --

16   and they say, We have an invention on converting a DICOM

17   image.  That's not what's claimed in this patent.  What's

18   claimed in the patent is an image that's not browser

19   compatible.  Now, they use DICOM as an example, absolutely,

20   in the specification.  It's right there in column 10.  They

21   talk about DICOM as being an example of a

22   non-browser-compatible image.  And what that means, Judge,

23   just so we're clear, it means that you can't take that image

24   and display it, as Mr. Lester was explaining, in a browser

25   without it -- without requiring some additional download or

1    software.  But today that's technically not correct.  You

2    can download DICOM.

3        And again -- again, at a preliminary injunction

4    standard, where the issue is not whether we're going to win

5    in terms of the ultimate merits, in terms of the trial, the

6    issue is whether we raised a fair question.  There is

7    absolutely, Judge, a fair question as to whether or not

8    DICOM is a browser-compatible image.  And I'm happy to walk

9    through the Court with that and why that is.  I don't want

10   to belabor the Court' time on that, but I will say, I guess

11   for brevity --

12            THE COURT:  Well, we'll accept that at the time

13   the patent was in existence it dealt with DICOM as not being

14   browser acceptable.  What happened since then is not really

15   relevant.  But just in terms of then, that meant what their

16   patent was because it was not browser compatible at that

17   time.  We'll accept that.

18            MR. TRUAX:  Fair enough, Judge.

19        So the issue then is so what's browser compatible now

20   and then, in combination, what is it -- the way they've

21   defined "browser compatible" -- and I understand there's

22   constructions offered in the PI and now there's new

23   constructions offered.  I certainly want to adhere to Your

24   Honor's directive to stick to the PI papers, but I believe

25   the issue -- the current construction of browser or browser

1    compatible -- they say that a browser-compatible format is

2    one that doesn't require any software -- additional software

3    they call applets or plug-ins to be downloaded to run.

4    That's their definition.  And they also define "software

5    executing outside the browser" to be basically the same

6    thing.  If there's software that requires a download or a

7    plug-in, its software executing outside the browser.

8        Now, that creates a problem for them because it's a

9    conundrum.  It's a -- and it's a little bit of a brain

10   twist, Your Honor; but if you work your way through it,

11   here's the problem.  There's something called JavaScript and

12   JavaScript is different from Java.  You hear all these -- I

13   don't want to turn you into a programmer and I'm certainly

14   not a programmer, Judge, but JavaScript is different.  The

15   patent talked about Java, but it then talks about Java in

16   all these ways where Java has all these limitations, et

17   cetera.  The patent doesn't mention JavaScript; but in any

18   event, it's our position that -- to be clear, that

19   JavaScript is a software, for purposes of this patent, that

20   runs outside the browser.

21       They say, No, no, that's not right, Merge.

22            MR. LESTER:  Your Honor, I hate to interrupt

23   counsel's argument, but this has gone way beyond what's --

24   any of the issues that have been raised in the papers.

25            THE COURT:  It's all new stuff that you're talking

1    about.  If JavaScript was not available then -- and you can

2    tell me whether it was or not, but you are seeming to put me

3    in the modern-day environment as opposed to what we're

4    dealing with in terms of the patent that's in existence

5    here.  That's why I was limiting you to what's before the

6    Court as a part of a preliminary injunction.  At claim

7    construction later on all of this may very well be relevant

8    and important.

9            MR. TRUAX:  Okay.  Thank you, Your Honor.  And I

10   apologize.  I am trying to adhere to Your Honor's directive

11   and I will work to do that.  I do think it's, respectfully,

12   important for the Court as a matter of claim construction

13   even at this very preliminary stage that the Court --

14           THE COURT:  But the Court -- as you're aware, the

15   Court at a preliminary injunction stage can make a

16   construction relevant to the preliminary injunction and may

17   modify that at claim construction time.  So the Court's not

18   foreclosed from, even if I agree with everything the

19   Plaintiff said, making some modification later as the case

20   is fully developed.

21           MR. TRUAX:  Okay.  Again, I appreciate, Your

22   Honor.  I'll move through this.

23      I think the fundamental point, Your Honor, is whether

24   these two terms, which are addressed in the PI papers, these

25   two constructions as to whether or not there's software

1   running outside the browser or something is browser

2   compatible -- we believe Merge has absolutely raised a fair

3   question about that; and on that basis alone, Your Honor,

4   the PI should be denied, because they can't show likelihood

5   of success on the merits of that.

6       And Your Honor asked earlier -- and I won't address it

7   any more than I have, that "on the fly" processing issue.

8   Again, that's another issue where there's been a fair

9   question raised --

10              THE COURT:  Well, the question is whether or not

11  they disclaim it and you've addressed that.

12              MR. TRUAX:  Yes, Your Honor.  So -- Your Honor, so

13  that's the issue with respect to noninfringement that's

14  presented in our papers; and again, we believe there's a

15  fair question.  With respect to the issue -- and when I say

16  "our papers," I mean the papers that were filed as of March

17  16.

18      With respect to the issue of invalidity, Your Honor, as

19  Heart IT's counsel referenced, we did assert a number of

20  bases for the patent being invalid and Your Honor is

21  familiar with the concepts of 102 and 103.  I won't go into

22  those, but you know, 102 -- you know, the law of

23  anticipation is again a basic principle here.

24      This patent -- this Feingold reference and the Sakusabe

25  reference, as I said earlier, were not before the Patent and

1    Trademark Office.  As Your Honor knows, the burden again

2    is -- the burden is on the accused infringer to show a

3    substantial question.  Vulnerability is the issue at this PI

4    stage, not whether we're going to ultimately win.  And I

5    would suggest -- and I'll be happy to go through it, but

6    even with the points that Mr. Lester raised regarding

7    Feingold, we've met those.

8        I think what's telling is the big invention that they

9    claim came out of this is somehow this zero-footprint

10   viewer; that it was able to take a DICOM image, which was

11   not viewable in a browser -- a standard browser -- that's

12   the big invention that we're told in these papers.  And yet

13   readily they agree that in the Feingold reference and in the

14   Sakusabe reference that that's disclosed.  That's not --

15   that wasn't some great new idea because Dr. Feingold came up

16   with that idea and Mr. Sakusabe came up with that idea

17   before the Merge folks did -- before the Heart --

18           THE COURT:  The distinction that he makes in his

19   argument is that, even though they made reference to it,

20   they rule it out as being something that was feasible to

21   work.

22           MR. TRUAX:  Well, Your Honor, that I think is --

23   they argue -- well, they argue that it's different.  They

24   argue that somehow -- and I believe if I captured the points

25   that Mr. Lester cited in his brief and what he's put here is

1    that he's argued that, one, he agrees that it's browser

2    compatible because it talks about a GIF format, but what he

3    focuses on is he says that Feingold anticipates reducing the

4    image or compressing it in such a way that you couldn't make

5    a medical diagnosis.  I think that was his example.

6         Now, the term "medical diagnosis," Your Honor, is a

7    highly subjective term.  What Dr. Judd may need to make a

8    medical diagnosis may be different than what Dr. Clunie

9    needs and so to say -- and that's -- frankly, we'll get to

10   that in the trial on the merits of this case.  That's

11   another fundamental problem with this patent because it

12   lacks definiteness.  I mean, there's a whole problem around

13   the term "medical diagnosis."  It's -- one cannot precisely

14   understand what it means in this patent.

15        As Dr. Grizzard said yesterday when we deposed him, he

16   cited the Supreme Court's opinion about respectfully-- you

17   know, obscenity.  You know it when you see it.  Well, that's

18   classically the type of statement that the Federal Circuit

19   has said is -- renders a claim to be invalid.

20        But we don't even have to get there because in the

21   context of medical diagnosis -- here's an image and I'm

22   putting it up on the screen in front of you.  That's a

23   hundred percent.  This is a hundred percent conversion,

24   captures every piece of the pixel.  And let me put up 25

25   percent.  That's what's claimed by Feingold.

1          Now, if you're an orthopedic guy and you're trying to

2     diagnose whether the image on the left involves a broken leg

3     or arm and the image on the right involves a broken arm, I

4     would say that the image at 25 percent -- absolutely you can

5     make a medical diagnosis, anybody can make a medical

6     diagnosis, that there's a broken bone in the right-hand

7     picture.  So to suggest that -- you know, even if we

8     compress it further down to 6.25 percent you can make that

9     distinction.  So to suggest that --

10               THE COURT:  Well, a broken bone is different from

11    some defect of the heart.

12               MR. TRUAX:  Certainly, Judge.  There are

13    instances -- the point is we're stuck with the claim

14    language and the claim language talks about "medical

15    diagnosis."  It doesn't say a hundred percent.  It doesn't

16    say that.  It talks about "without loss of diagnostic data."

17    Well, what does that mean?  I mean, there's -- "without loss

18    of data sufficient to make a diagnosis."  Well, can you make

19    a diagnosis based on 25 percent?  6.25 percent?  The --

20               THE COURT:  Well, if you're putting up an image of

21    a heart and making that same argument, I might be able to

22    answer you differently.

23               MR. TRUAX:  Well, Your Honor, the answer may be

24    the same.  I don't have a heart to put up today.  I mean, I

25    came with a bone, but the --

1      THE COURT:  Well, a broken bone is a broken bone.
2  At 10 percent I can tell that.
3      MR. TRUAX:  Exactly, Judge, and that's exactly the
4  point.  In the context of the patent -- we're talking about
5  the patent and the claim language in the patent; and the
6  patent claim language, which we're bound by, talks about
7  medical diagnosis, not of a heart.  It's not talking about a
8  heart.  It's any.  And so if Feingold anticipates this for
9  anything, for any such --
10      THE COURT:  Are you suggesting that what Heart
11  Imaging has would apply to any kind of medical diagnosis and
12  not specific to hearts?
13      MR. TRUAX:  Absolutely, Judge.  That's certainly
14  what they're claiming.  I mean, these products are not --
15  the products that they're trying to stop us from selling
16  don't relate to hearts -- are not limited to hearts.
17      THE COURT:  Certainly in terms of what you
18  illustrated or they illustrated as a part of your person
19  making a demonstration, he was showing the heart on the
20  iPad.
21      MR. TRUAX:  Yeah, that's correct.  That was their
22  product and they put up a picture of their product that
23  showed a heart.  That's correct.  But their product, as I
24  started out with --
25      THE COURT:  Well, I was thinking of what he was

1    saying; that your agent or salesperson was out selling --

2    producing an iPad to show that it had the additional

3    features that they were claiming were infringing.  They were

4    showing your infringing product.

5              MR. TRUAX:  Fair enough, Judge.  I apologize.  I

6    misunderstood your question.  You're correct.  That's

7    correct.  On the YouTube video.  I apologize.

8         But the point, Judge, is that if you -- there's a lot

9    packed into that question, Your Honor.  First, in terms of

10   the products that we sell -- and I don't want to digress too

11   much, but we sell a whole suite of products.  One of the

12   suite of products that we sell is something called a Cardio

13   PACS and I'll explain what that is if the Court has

14   questions about it.  But in the context of a Cardio PACS,

15   there is all kind -- there's a suite of software that goes

16   with that, including a full diagnostic viewer they call it;

17   and a full diagnostic viewer has all kinds of very robust

18   tools on them, which I would expect that even Heart IT would

19   concede uses software running outside the browser on that

20   Cardio PACS product.

21        They're claiming infringement with respect to something

22   called a universal viewer product, which is part of the

23   Access suite, all sort of embedded in a larger suite of

24   products.

25        The point, Judge -- and I don't want digress but stay

1    on the claim language.  The claim language talks about

2    medical -- data -- diagnostic -- data sufficient to make a

3    medical diagnosis and it's not limited to a heart.  They

4    don't -- if they had claimed that this was only limited to a

5    heart, we would have a different case.  That's not the case

6    we're dealing with.  We're dealing with a claim that talks

7    about diagnosis of this bone right here, as well as a heart,

8    as well as everything else.  That's what's at issue.

9        Your Honor, respectfully, Feingold anticipates; and for

10   purposes of this PI hearing, absolutely we've raised a

11   substantial question of it.  The fact that it wasn't even

12   presented to the patent office should raise a big flag,

13   number one; but number two, the distinctions that -- the

14   medical diagnosis distinction, respectfully, is not -- is

15   not a base -- doesn't defeat the substantial question that

16   we've raised.

17       And the argument about images, that there's not a

18   plurality of images and image series, I encourage the Court

19   to read the Feingold reference; and I think after reading

20   the patent, if you read Feingold, you would understand that

21   that's a hypertechnical reading of this, which is not

22   contemplated by Section 102.  We have raised a fair question

23   about that, Judge.  Yeah, it's not correct, as my colleague

24   says.  In any event -- Your Honor, so on the issue of

25   invalidity, we believe they fail.

1    Now let me talk briefly, Your Honor, about -- on
2    irreparable injury.  I think the second prong of this PI and
3    what the injury is going to be -- we have -- and again, I'm
4    going to limit myself to what's in the papers.  I mean, we
5    did take Dr. Judd's deposition, which was a 30(b)(6)
6    deposition, on the issue of irreparable injury and that was
7    taken, Your Honor -- that was noticed up in April and it was
8    not scheduled until last week.  So the testimony from that
9    is recent but -- and we have an interrogatory answer from as
10   recently as last night about it.  Your Honor, on the issue
11   of irreparable injury -- from the Plaintiff's an
12   interrogatory response.

13    Your Honor, the issue of irreparable injury, you know,
14   again it's hard to quantify.  I mean, certainly I agree that
15   you'll find cases -- and we cited a lot of these cases to
16   you and Your Honor has seen them; I'm sure Heart cited a
17   few of them -- about where preliminary injunctions were
18   denied because of lack of irreparable injury.  Heart IT
19   cites the *Hybritech* case, which, of course, goes back to the
20   late '80s.  They also cite an *Abbott* case, which is a more
21   recent case.  We cite a plethora of cases as well where the
22   court -- the Federal Circuit concluded irreparable injury is
23   not met.

24    One thing -- there's a couple principles that come out
25   of those cases I think, Judge.  One is that loss of sales by

1    itself is not enough to establish irreparable injury.  The

2    fact that Heart IT may lose a sale, that's not irreparable

3    injury because that's compensable at some later date.  Even

4    the court says in the *Automated Merchandise* case, Your

5    Honor, talks about even in the case -- and that's a Federal

6    Circuit case, Your Honor, which is cited in our briefs, a

7    2009 opinion, where the Federal Circuit again talks about

8    irreparable injury in that context where loss of market

9    share -- even loss of market share wasn't enough.

10       Now, why in those cases, when you parse through them,

11   does the court say that's not enough?  Ultimately, Your

12   Honor, when I think you piece through it all, it comes down

13   to proof and it circles back to that burden question.  The

14   Plaintiff has the burden and, respectfully again, the

15   Plaintiff here has not met its burden of offering any

16   irreparable injury.  Instead, we get conclusory statements

17   like "We're going to lose market share" or "Merge has a big

18   section of the -- has a big segment of the market," a

19   conclusory statement offered with no proof.

20       And to Your Honor's question about the nexus issue, why

21   did Ascension Health decide to -- to go with this product,

22   they could have offered that as proof by deposing somebody

23   from Ascension Health -- from Ascension.  They could have

24   gotten an affidavit from somebody from Ascension.  They have

25   none of that, nothing.  So the fact is there's a failure of

1    proof on that issue.

2       And in the case of Ascension Health -- and I'd be
3    prepared to have Mr. Tolle testify if Your Honor wanted to
4    hear from him today on that issue, but he walks through a
5    whole litany of issues which Your Honor has -- has
6    referenced in a question about the different desirability
7    features.  Merge, Your Honor, sells sort of -- basically
8    three categories of products and I think it's important that
9    Your Honor understand that because I think there's some
10   confusion about, you know, what's at issue here.

11      So Merge -- Merge has basically two primary customers.
12   They have hospitals and then they have these ambulatory
13   clinics outside the hospitals.  And, of course, there's
14   doctors within the clinics and in the hospital.

15      And they sell three different kinds of product
16   categories.  They sell what's called a PACS product, which
17   we talked about earlier.  That does all kinds of things.
18   The PACS system will have all kinds of things.  It would
19   include software that relates to a scanner.

20      You know, Merge doesn't sell the scanner.  GE, Philips
21   sell the scanner; but GE and Philips also sell software to,
22   you know, get loaded into the system to have that image from
23   the scanner read to a PACS system.  And there's all kinds of
24   reasons why some of the big players in this market, this
25   PACS market, are companies like GE, because GE has a large

1    financing arm.  They make the scanners.  They finance the
2    scanners and then they are able to bundle that with software
3    and sell it to a particular provider.  So GE is a very
4    significant competitor in this arena.  Philips would be
5    another one, Siemens.
6        And there's a whole list of these that Mr. Tolle has
7    laid out in his declaration, Your Honor, which we reference
8    at paragraph 15, which Your Honor likely saw, starting on
9    page 6.  He lists there all of these various competitors in
10   what's called the medical viewer market.  Now, a PACS system
11   includes a viewer, includes a scanner, includes all sorts of
12   things, but it also includes a viewer or can include a
13   viewer.
14       And there's lots of competitors.  Mr. Lester is
15   correct.  There's lots of competitors in this viewer market:
16   Calgary Scientific, Client Outlook, Vital Images, TeraRecon,
17   Agfa Healthcare, Carestream, and the list goes on.  You can
18   look at that in the declaration.  And if you were to narrow
19   that market even more so to the zero-footprint viewer
20   market, that's recited in paragraph 17, Your Honor, where
21   there's all these other competitors:  Carestream, Client
22   Outlook, TeraRegion (sic), you know, Medical Insight,
23   Calgary Scientific, Vital Images.  Okay.  Lots of
24   competitors.
25       Why does that matter?  Well, one of the issues is is

1    Heart going to be irreparably injured by failing to enter an

2    injunction today and waiting until we have a trial on the

3    merits where the Court can have and the jury can have a full

4    record on this issue.

5         Well, Your Honor, Dr. Judd testified last week about a

6    new transaction, a transaction involving Englewood Hospital

7    that -- and this I think highlights the issue of why there's

8    no irreparable injury.  It's not as if you enjoin Merge and

9    somehow Heart IT is going to have some great windfall.  Even

10   if they could show irreparable, even if they could show

11   likelihood of success on the merits, which they can't,

12   Englewood Hospital, Your Honor -- they competed for

13   Englewood Hospital against ten or eleven other entities,

14   including Merge they say, although Merge, Mr. Tolle will

15   tell you he didn't know that he was competing against Heart

16   IT.  That was news to him.  They compete against Merge.  And

17   who wins that deal?  Heart IT?  No.  Heart IT doesn't win,

18   but they want you to believe that somehow, man, if Merge

19   hadn't been in there competing they might have won.  Well,

20   did Merge win the deal?  No, Merge didn't win the deal.

21   Englewood won the deal.  Excuse me.  Vital Images won the

22   deal for the Englewood Hospital deal.  So there's no --

23   there's no injury to Heart IT because Merge was out there

24   competing.

25        Moreover, there's no evidence, none -- and that again

1    goes to the issue of burden, Judge -- no evidence about what

2    was actually offered to these various lost opportunities.

3    As Your Honor asked, well, what other suite of products was

4    involved.  I mentioned at the outset, when I started this,

5    because I felt compelled to respond to it immediately, this

6    issue about a vendor neutral archive.  What drives sales in

7    this market?  Mr. Tolle put in his declaration -- he

8    references something called interoperability.  And what is

9    interoperability?  Again, another sort of fancy marketing

10   word.  There's a lot of facets to interoperability and one

11   of them --

12            THE COURT:  I'll accept that.  But the point of

13   the question is whether or not zero-footprint technology was

14   the only reason why they lost.  To the extent that if you

15   accept that Merge had it and was using it, is that the only

16   reason they lost market share or lost any particular

17   potential client.

18            MR. TRUAX:  Answer:  Absolutely, unequivocally no.

19   Mr. Tolle has noted that in his declaration and he will be

20   absolutely prepared to testify, Your Honor, if you want to

21   ask any questions about that.  Absolutely it's not tied to

22   the zero-footprint viewer.

23        Is the zero-footprint viewer -- assuming it were --

24   they could prove that it likely infringes and the claim --

25   the patent is not anticipated, you know, it's -- you know,

1    we market the zero-footprint viewer.  You saw that in the

2    YouTube video.  We put it in our -- there's marketing

3    literature about it that Mr. -- Mr. Lester and the Heart IT

4    folks have attached to the PI, but that -- there's no

5    evidence that that's the nexus; and the nexus requires,

6    absolutely requires that there be a nexus between the

7    alleged infringement and the alleged purchase.

8         Your Honor, I appreciate you -- you know, you being

9    patient with me as I work my way through this.  I want to

10   cite one last thing on the irreparable injury point and I

11   think this -- and I perhaps should have started with this

12   because I think, frankly, this PI motion could start here

13   and end here.

14        Judge, this patent issued in April of 2012.  Now,

15   there's a history to this patent and there's a history to

16   Merge's -- to Heart IT's belief that Merge was somehow using

17   its patent.  This is all in the record in the PI papers.

18   There are three patents that were filed in the complaint in

19   September.  The two other patents that are at issue were

20   filed -- were issued by the Patent and Trademark Office in

21   2005 and then again in 2008.

22        And Heart IT believed that Merge was infringing its

23   patents.  It wrote to Merge in 2011 in January, before the

24   '381 patent issued, and said, "You know what, Merge?  You're

25   using a zero-footprint viewer and you're violating our

1    patents." And they expected to hear a response because they

2    expected they would be able to work out a, quote, amicable

3    resolution with Merge.

4         That too is important, what that amicable resolution

5    means; because for purposes of an injunction, even if you

6    were to conclude that they're right on the infringement,

7    they're right on invalidity, that they're right on all of

8    those things, if they were prepared to give a license to us

9    in 2011 that -- that defeats the PI because the fact is the

10   Court has said and -- clearly in cases that if they're

11   willing to license there's no irreparable injury.

12        But put that to the side. The issue here is one of

13   timing and the delay here by itself defeats this PI. This

14   patent is applied for in 2005. Now, to no fault of Heart

15   IT, the patent office was very slow. Nothing happened.

16   They filed this application with the patent office in 2005;

17   and in January of 2011, Your Honor, right at about the time

18   that they sent Merge a letter claiming that Merge was

19   infringing these other patents, which had basically the same

20   specification, the same Figure 1 and Figure 3 as are now in

21   the '381 patent, the patent office issued what it calls its

22   first office action. And you can find that in the file

23   history. That's a public record. And that patent that --

24   the examiner rejected all the claims, rejected all the

25   claims. And then it took -- and then Heart IT's lawyer then

1    submitted, as often happens, very routine, submitted a

2    response to that.  Eventually the patent goes through this

3    whole examination process.

4        All that while Heart IT is studying Merge's products.

5    Dr. Judd has confirmed that, studying it in January of 2011

6    after it sent its letter, February, March, April, all

7    through 2011 studying Merge's product.

8        The patent eventually -- there's something called a

9    notice of allowance that's issued by the patent office on

10   February 9th, 2012, Your Honor.  That's significant.  And

11   they had -- as often happens, as is routine, they had a

12   certain number of days after that to pay their issue fee to

13   get that patent, you know, issued.  They could have waited

14   until the end of May.  Did they do that?  No.  They

15   understood what urgency was, at that time anyway.  And what

16   did they do?  They quickly paid the fee and Dr. Judd signed

17   the declaration on March 12th, just a couple weeks later,

18   and the issue fee was paid within a few day after that.  And

19   the patent then issues before the issue fee was even due in

20   April and so they get their patent in April.

21       Now, do they do anything then?  Do they -- did they

22   rush into court given this claim that they have asserted

23   back in 2011?  Nothing.  They do nothing in May, in June,

24   July.  We get to September and they file a complaint and

25   they assert three patents, the three patents that are at

1   issue in this complaint, including the '381 patent.  Do they

2   ask, Judge, for a preliminary injunction then because it's

3   urgent?  I mean, they've been making this claim for a year

4   and a half -- more than a year and a half by then and even

5   before that they've been investigating it.  They do nothing.

6   Instead, they wait until virtually New Year's Eve to file a

7   motion for a preliminary injunction before this Court.

8       Now, why do they wait?  Well, the explanation we're

9   given, respectfully, is not very compelling.  There's no --

10  "Because we're a small company we couldn't get it together.

11  We couldn't pull the resources together."  Your Honor,

12  that's not a justification.  And the Federal Circuit has

13  been clear that that kind of delay, which I would suggest

14  goes back -- you know, if this was so compelling, why didn't

15  they sue in 2011 on the two patents that they claim in this

16  lawsuit are infringed.

17      Your Honor, I would suggest that -- and to be clear,

18  Dr. Grizzard yesterday testified that the inquiry that he

19  did, the nonexpert who submitted the declaration to offer up

20  their proof of infringement -- so I'm not sure what

21  Dr. Grizzard's declaration is now.  Certainly when we read

22  it, we thought he was being proffered as an expert, but I

23  guess not.  But Dr. Grizzard told us yesterday that he spent

24  only eight to ten hours coming up with his conclusions.

25  Well, I don't -- I'm at a loss as to why that couldn't have

1    been done in 2011, certainly shortly after April of 2012.

2        Their answer -- and they'll give you this explanation

3    about something called "meaningful use."  You may hear that

4    term.  It's in the papers there and in Dr. Judd's

5    declaration.  Again, I'll be brief about this.  "Meaningful

6    use," Judge, was -- is a -- basically an incentive program.

7    It's part of the stimulus program.  It actually originated

8    under President Bush originally, but then President Obama --

9    it was part of the economic stimulus package.  It was a

10   program put in place in the Department of Human Services to

11   help Human Services to encourage medical providers to do

12   certain things, and there's something called Stage 1

13   "meaningful use" and Stage 2 "meaningful use."

14            THE COURT:  Let's stick with the harm question at

15   this point.

16            MR. TRUAX:  Okay.  So bottom line, Judge, is that

17   the timing, in our view -- a "meaningful use" does not

18   provide a basis for them to have delayed as long as they

19   did.

20       Your Honor, finally -- this is in the Tolle

21   declaration.  I won't belabor it.  You know, if you were to

22   enjoin them -- enjoin Merge from doing what they've asked

23   you to do, you would be enjoining the iConnect platform.

24   The iConnect platform doesn't include just a viewer.  It

25   includes a vendor neutral archive which is used -- so you're

1    clear what that is, Judge.  When you have -- when a

2    hospital -- there's a hospital called Dignity medical

3    systems.  They have seven different PACS systems in their

4    hospital.  They have a GE system, maybe a Philips system, a

5    Siemens system and some other system; and those systems all

6    have to talk to each other.  All those images have to be put

7    into a vendor neutral archive, in one place, so they can all

8    be stored and all the systems can talk to each other.

9        That VNA is not what's being accused here.  Instead,

10   what's being accused here is the viewer, which is part of

11   that suite of products.  If you enjoin iConnect, it will

12   have a devastating impact on the product line for Merge.

13   Mr. Lester cites -- he says it's 3 percent.  I'm not sure

14   where they get that.  I mean, Mr. Tolle has submitted a

15   declaration to you telling you that it's closer to 13

16   percent of their revenues as of last year, that suite of

17   products.  That would have an enormous impact on Merge as a

18   company, not to mention, frankly, the rippling effect on

19   other parties, hospitals.

20       Lurie Children's Hospital in Chicago -- I don't mean to

21   be overly dramatic -- they have a Merge system in there with

22   a whole suite of products.  If they're not permitted, if

23   they're somehow -- if that is interrupted, healthcare

24   quality is going to be interfered with.  That's not -- when

25   you weigh that in the balance of hardships, that's not

1    enough.

2        Judge, you've been patient with me.  I will take leave

3    of this, but I just leave you with this.  I appreciate your

4    time.  I think again, when you come down to this, the issue

5    is one of burden.  Respectfully, the Plaintiff has not met

6    its burden on the papers alone that have been submitted to

7    you because it fails proof.

8        But even if you get through the proof that they've put

9    in front of you, the Grizzard declaration, which is -- I'm

10   not sure what that is now.  But even if you work your way

11   through the Grizzard declaration, you cannot overcome this

12   substantial question of noninfringement that we've raised,

13   the infringement issues we've discussed, the

14   Feingold/Sakusabe issues that we've discussed, and then

15   fundamentally this timing question.  That by itself, Judge,

16   is fatal.  And if it cannot prevail on either likelihood of

17   success on the merits or irreparable injury, you don't even

18   get to balance of hardships or the public interest.  The law

19   is clear that you must deny the PI on that basis.

20       Your Honor, thank you very much for your time.

21           THE COURT:  Yes, sir.

22       Mr. Lester, I will give you a brief moment to respond.

23           MR. LESTER:  Thank you, Your Honor.

24       Let me first talk about Dr. Grizzard.  He's an expert.

25   He's a radiologist.  He submitted a declaration that said he

1    felt that there was infringement, but we told Merge

2    yesterday that he's -- (A) he's not here today because he

3    had a death in the family, but (B) he's -- we're proffering

4    him for the experiments he did.  And that's all I cited from

5    what he did.  He uploaded DICOM images and he downloaded PNG

6    images.  That's all we used his testimony for and that's all

7    he needs to -- so he doesn't need to be an expert on claim

8    construction in order to be valuable in that respect for our

9    case.

10        Now, with respect to the whole disclaimer of "on the

11   fly" issue, that wasn't an issue in the briefing.  I would

12   urge the Court not to even consider it today; but if you do

13   want to talk about it, let me go back and visit it.  None of

14   the cases they cited in any of the briefing talked about

15   disclaimer.  It's a high burden to get -- to say that a

16   patentee has disclaimed something in the patent; and if you

17   would like to talk about it, I'll be happy to.  It's -- it

18   has to be clear.  It has to be unambiguous.  And what

19   they've cited as the reasons for us disclaiming "on the fly"

20   are not either one of those.

21        You've already looked at Figures 1 and 3.  There are a

22   lot of other differences in Figures 1 and 3 that bring out

23   the difference between "on the fly" and "not on the fly."

24   Figure 1, when you get to step 200, it says ask for a single

25   image.  Figure 3 when you get to step 200, it says ask for

1    all images in the study.  And this comes to the essence of

2    being able to use an imaging standard for diagnosis.  You

3    have to be able to get all of the images and deal with them,

4    and you don't want to have to go back, like in Figure 1, and

5    go ask for them one at a time, which is what the prior art

6    would give you.  In our system, as well as in Merge's, when

7    you click on that pointer that gets you to the study, you

8    get all the images in the study.  And that's the essence of

9    what was being taught in the comparison between the prior

10   art and the -- when it was talking about "on the fly."

11        Also, an essential element to remember when you're

12   talking about the discussion about "on the fly," it was in

13   column 3.  That's in the background of the invention.

14   That's not in -- where he's talking about "This is what my

15   invention is about."  He's just talking about the pros and

16   cons of the prior art.

17        I would want to correct -- Mr. Truax said that in

18   response to Wood causing a rejection is when we made the

19   statements about Wood.  That's incorrect.  The statements

20   about Wood are in the specification where it's just

21   discussing the background.  So that was not in response to

22   any rejection.  What we've got is a discussion of Wood and a

23   discussion of Java saying some of the those things can

24   create delays, but that's not a disclaimer.  And the case

25   law is pretty clear that you can discuss the issues or

1   problems with the prior art, particularly if it's --

2           THE COURT:  A big part of what I understood he was

3   attempting to say is the patent office was basically telling

4   you that Wood already addressed the issue and you had to

5   distinguish what you had from Wood.

6           MR. LESTER:  Well, again, the patent office later

7   on did make a rejection based on Wood and the arguments that

8   were made in the prosecution history had nothing to do with

9   "on the fly."  The arguments that distinguished Wood dealt

10  with other aspects of Wood.  Now, that's not in the record

11  in front of you right now.  We would certainly have to deal

12  with that in claim construction, but the snippet that he

13  showed you that talked about Wood and said that Wood does

14  "on the fly" processing also talked about a lot of other

15  distinguishing factors with respect to Wood and said what

16  Wood -- it just described that these are some of the

17  problems of the prior art.  It didn't distinguish it and it

18  certainly didn't disclaim it as a solution.

19      When you look at the disclosure in the patent that

20  describes our invention, it doesn't say we don't do it "on

21  the fly."  It doesn't ever say you have to have the

22  processing all done before the user requests the image.  It

23  leaves it open.  Now, in the preferred embodiment, which is

24  illustrated in that Figure 3, it could be that the entire

25  set of images is converted and ready and available to be

1    looked at.  In fact, it describes that later on in the

2    patent as part of the preferred embodiment where you can set

3    up an image storage system and an archiving system, but it

4    doesn't limit it to that.  It says:  Here is our preferred

5    embodiment.  But it certainly does -- and in fact --

6              THE COURT:  How do you create any boundaries on

7    what the patent is, though, if you can sort of move and

8    shift as you go?

9              MR. LESTER:  Well, the boundary comes in the

10   claims.  The boundary -- the claims lay out what are the

11   metes and bounds of what we claim, and what we say is it

12   just has to be converted before it's transmitted.  That's

13   what the claim says.  That's what -- the patent office

14   agreed with that.  That's what they allowed us to claim.  We

15   didn't -- if we had been limiting it to before it's

16   requested, we could have easily said that.  We could have

17   put that in Figure 3.  Figure 3 doesn't put any --

18             THE COURT:  Are you locked in at this point,

19   Mr. Lester, in terms of DICOM being a non-web-accessible

20   browser or non-web-accessible device?

21             MR. LESTER:  Yes, sir.

22             THE COURT:  Are you locked in on that in terms of

23   your claim?

24             MR. LESTER:  Yes, sir, I believe under the way the

25   Court needs to construe the patent, if the patent defines it

1    as non-web compatible, it's non-web compatible.

2              THE COURT:  All right, sir.

3              MR. LESTER:  Now, in terms of distinguishing

4    Feingold, let's move to that invalidity argument that he

5    made.  He says it doesn't mean much; that it only gives you

6    a series at a time or it only gives you a certain set of

7    images.  That again goes back to the requirement for

8    diagnosis.  You have to be able to navigate all the series

9    in the imaging study in order to find the right image that's

10   going to give you the good diagnosis.  Feingold was never

11   designed to be diagnostic.  He reduced the quality of the

12   images.  He didn't give you the ability to navigate the

13   study, all of which are essential elements of our claim

14   so --

15             THE COURT:  But is it true, as I made response to

16   Mr. Truax, that Feingold says there's talk of this, but it's

17   just not feasible to do the kind of thing, and that was your

18   inroad to say:  Well, let's do that.  Let's show it can be

19   done?

20             MR. LESTER:  I'm not sure Feingold ever suggested

21   that it could be used for diagnostic purposes.  He's

22   basically laid out as his reason to go out and try to

23   distribute reports to referring physicians.

24             THE COURT:  But wasn't it your statement you

25   basically looked to Feingold to the extent it said, no, this

1   can't be done and you would said say, yes, let's do it?

2            MR. LESTER:  I'm not sure that was Feingold I was

3   referring to.  The --

4            THE COURT:  Well, whichever one it was.

5            MR. LESTER:  There was a reference that -- there

6   were several references that taught against this.  I think

7   it was DeJarnete that said you can't do this.  That's right.

8   And then we went out and figured out how to do it.

9   DeJarnete, who was slightly after our invention date,

10  suggested you could do it with just web browser-compatible

11  images.  Well, he said, "Here's a system that would use

12  web-compatible images."  And then he said, "But it's only

13  good for sending the reports back to referring physicians.

14  It can't be used for diagnosis."  And again, that's a

15  positive factor, we believe, in terms of proving the

16  validity of our patent.

17       When you get to the question of irreparable injury,

18  Mr. Truax was asking, you know, what's the next -- why is

19  this product going to be -- have an impact on sales of other

20  products, of the iConnect suite.  I mean, their own

21  marketing literature says that three components are critical

22  to the success of an enterprise imaging strategy.  You have

23  to have your neutral archive.  You need your DICOM gateway

24  and you have to have a universal viewer.  This is the

25  critical element that is allowing people to get out there

1    and sell the vendor neutral archive solutions that hospitals

2    want these days.  The zero-download DICOM viewer, as Merge

3    points out in their own literature, is a critical piece of

4    this whole product.

5        Now, we're not trying to get them to stop selling their

6    vendor neutral archives.  We're not trying to get them to

7    stop selling their DICOM gateways.  We just want them to

8    stop selling the zero-footprint viewer.  They've got other

9    viewers.  We've got evidence of that.  They could put those

10   on top of their vendor neutral archive and stop infringing

11   what's covered by our patent.

12       I'm not sure -- are there any other elements that I can

13   address for you, Your Honor?

14            THE COURT:  Only if you wanted to address what he

15   raised.  That's why I give you this opportunity.

16            MR. LESTER:  Okay.  Let me take a quick look.

17       (Pause in the proceedings.)

18            MR. LESTER:  I just want to reemphasize when we're

19   talking -- again, talking about Feingold and the loss of

20   resolution, they showed you those pictures there of the

21   broken bone.  Within our file history, we clearly pointed

22   out that the -- and it's in the document that I referred you

23   to -- that "lossless" is what's being described as a

24   diagnostic-quality image.  That means not going down to

25   those loss of resolution.  Again, when we get into claim

1    construction, we've got a whole plethora of other arguments
2    that we'll bring up on that, but I'm just limiting it to
3    what we have got in the record.  For it to be a
4    diagnostic-quality image, it has to maintain the same
5    resolution as the original image.  And that wipes out the
6    Feingold reference as well.
7         Again, Your Honor, the final point that he brought up
8    as being critical was our delay in bringing this motion.
9    The -- Heart IT is a small company.  I was working with
10   them.  They weren't doing nothing for those months after the
11   patent issued.  They were working with me to try to get this
12   case ready to go against a much larger company.  There is
13   a -- there was not a lack of inactivity.  There was a lack
14   of funding to enable them to be able to put on a patent
15   infringement case against a much larger competitor.
16        The meaning -- and originally there was no intent to
17   file a preliminary injunction, but when the "meaningful use"
18   guidelines came out -- they weren't finalized until August.
19   They didn't actually issue until October of last year.  When
20   those guidelines came out and said that image-enabling the
21   health records was going to be one of the reasons that --
22   one of the factors that was going to affect whether you're
23   achieving "meaningful use," then the urgency went up another
24   step.  A lot of hospitals, a lot of systems are in the
25   process of evaluating how they're going to meet that and

1    zero-footprint viewers are a -- one of the best ways to do

2    it and we feel like we should be the offerer of that -- the

3    primary offerer of that and we should not have to deal with

4    the infringement from these larger competitors.

5              THE COURT:  All right, sir.  Thank you.

6              MR. LESTER:  Thank you, Your Honor.

7              THE COURT:  Counsel, the Court will consider the

8    arguments that you made and the briefs that are relevant for

9    this proceeding and make a decision and notify you of that

10   decision.  Thank you very much.

11        We'll be in recess until further notice.

12        (Proceedings concluded at 12:25 p.m.)

13

14                    C E R T I F I C A T E

15        I, LORI RUSSELL, RMR, CRR, United States District Court
     Reporter for the Middle District of North Carolina, DO
16   HEREBY CERTIFY:

17        That the foregoing is a true and correct transcript of
     the proceedings had in the within-entitled action; that I
18   reported the same in stenotype to the best of my ability and
     thereafter reduced same to typewriting through the use of
19   Computer-Aided Transcription.

20

21                                          Date:  8-1-13

22   Lori Russell, RMR, CRR
     Official Court Reporter

23

24

25